THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BYRON MADISON, Defendant-Appellant.

Fifth District    No. 5—00—0343

Opinion filed October 11, 2002.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Angela Knuckle and Rosario James worked for D&D Motors, a used-car dealership in Fairmont City, Illinois. On December 31, 1998, they were the only employees working. Everyone else was enjoying the day off, awaiting the imminent celebration of a new year. Any plans that Angela and Rosario may have had for a festive evening were not to be. Neither would be celebrating that night.

Around noon, two men appeared at the dealership. As Angela and Rosario readied themselves for a possible sale, they discovered that the men did not come to buy a car. They found themselves looking down the barrels of two handguns. Byron Madison, the defendant, trained a .32-caliber automatic on them. His cohort, John Pickens, wielded a .38-caliber revolver.

The defendant and Pickens tied up Angela and Rosario at gunpoint. After the two sales attendants were securely bound, the armed duo easily gathered loot. They pocketed all of the dealership cash on hand, a tidy sum of more than $3,000. Pickens noticed that Angela was wearing a diamond ring, a token recently placed on Angela's hand after her acceptance of a marriage proposal. Pickens removed it.

While Pickens robbed Angela of her keepsake, the defendant looked over the keys to the car lot's inventory. He grabbed a set in order to commandeer a dealership car on the way out.

With Angela and Rosario unable to summon any immediate help, an easy and undetected getaway was ensured. But first, Pickens wanted to rob Angela and Rosario of one more thing—their future. He walked over to Angela, lowered his .38-caliber handgun to her head, and squeezed off a round. After inflicting a point-blank head wound, he fired another bullet into her back for good measure. Rosario watched. He no doubt realized his peril as Pickens turned toward him and again aimed to kill. Pickens raised his weapon, trained it at Rosario's head, and fired off the first of two rounds. He aimed and fired a second shot at Rosario's back. Pickens left the dealership, content in the belief that he had ended things for Angela and Rosario. He certainly did not expect to hear from either of them again.

Pickens' best efforts notwithstanding, neither Angela nor Rosario died. The bullet intended for Rosario's head passed through his neck instead. The second bullet lodged in his back. Rosario did not lose consciousness. It was the stroke of luck that saved Angela and Rosario

from bleeding to death on the dealership floor. Both of them lived to recount the events of that New Year's Eve day and to identify their assailants.

The defendant and Pickens found the car that fit the keys taken by the defendant. They got in and drove off, confident that their ride would not be reported stolen for quite some time. Rosario watched them depart. Spurred by his desperate condition and a will to live, Rosario struggled to free himself. In spite of his critical condition, he broke free and reported the robbery and shooting to the police. He also reported the make and model of the car in which the defendant and Pickens had driven off. An all-points bulletin was issued for the stolen car.

Moments later, an Illinois state patrol officer spotted the reported vehicle. When he engaged his sirens and attempted to close in for an arrest, a high-speed chase ensued. Other officers joined in. The chase ended when the defendant, who was driving the car, lost control and crashed. The police grabbed their stunned prey, removed them from the damaged car, and searched them. They found more than $2,000 in cash on Pickens and more than $1,000 in cash on the defendant. A later search along the route of the attempted escape yielded the two handguns that the defendant and Pickens had used in the robbery. The .32-caliber handgun was inoperable. The other weapon, a .38-caliber revolver, was in working order. Tests established that it was the gun used by Pickens in his effort to kill Angela and Rosario.

The defendant gave the police a self-serving statement. For some reason, the State introduced it into evidence at the defendant's trial, allowing the defendant a theory of defense without having to testify. The following self-serving claims were thus made known to the jury, without the test of cross-examination.

The defendant claimed that before he agreed to take part in the robbery, he told Pickens that he did not want anyone to get hurt. Based on his belief that Pickens would honor his wishes, he announced, when he entered the dealership, that no one would get hurt. He also claimed that Pickens' gunplay came as a total and unexpected surprise. In this regard, he pointed out that he had armed himself with a broken weapon that could not be used to kill anyone. In addition to these self-serving claims, the defendant admitted his complicity and role in the armed robbery.

Based upon these claims, defense counsel fashioned a defense that allowed him to stand before the jurors and tell them that the defendant should not be found guilty of anything other than robbery. The jurors disagreed. They found the defendant guilty of armed robbery, two attempted murders, and two aggravated batteries with a firearm.

The trial judge sentenced the defendant for committing the two attempted murders and the armed robbery. He found that the defendant's history of criminality fit the statutory criteria necessary to impose a punishment reserved for habitual criminals. Hence, he determined that the defendant's sentences for all three offenses should be the same. The defendant currently serves three prison terms, none of which expire until he does.

The defendant wants us to overturn his multiple convictions. Or in lieu of an outright reversal or a new trial, he asks us to vacate his natural-life prison terms. He maintains that we should remand for the imposition of a punishment within the statutory range available for offenders who are not habitual criminals.

■ We have already decided one of the sentencing questions raised here, when we reviewed the life sentences of the defendant's accomplice. See *People v. Pickens*, 323 Ill. App. 3d 429, 433-34, 752 N.E.2d 1195, 1199 (2001) (holding that the habitual criminal enhancement provisions contained in section 33B—1 of the Criminal Code of 1961 (720 ILCS 5/33B—1 (West 1998)) are constitutional and do not offend the constitutional rule established by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)). The defendant asks us to revisit our decision in his accomplice's case. We think we decided it correctly and decline the invitation to reverse ourselves.

We turn to the other three questions presented for our review.

The first question raised by the defendant has two paradoxical parts.

First, he embraces a brief passage of *dicta* written by Justice Cunningham in 1992 and submits it as authority for the proposition that an accomplice must share in his cohort's specific intent in order to be held criminally responsible for specific intent crimes committed in the course of another agreed-upon criminal venture. Justice Cunningham commented: "Accountability, tied as it is to the crime charged, must comport with the requirements of that crime. Thus, for example, the charge of assault with intent to rape, a specific intent crime, must require a specific intent for one who is accountable as well." *People v. Stanciel*, 153 Ill. 2d 218, 234, 606 N.E.2d 1201, 1210 (1992). Based upon this observation, the defendant maintains that in order to be held accountable for attempted murder, he had to share the specific intent to kill manifested by Pickens' conduct. He asks us to reverse his attempted murder convictions, arguing that the evidence belies a specific intent necessary to attribute guilt. Additionally, he points out that the jury was constantly misinformed about what was necessary in order to hold him criminally responsible for Pickens' murderous bent.

In his submissions to the jury, the prosecutor who tried the case steadfastly maintained a contrary view of criminal responsibility. He informed the jury from the trial's beginning to its end, in *voir dire* examination and during closing argument, that he did not have to prove the defendant's specific intent to commit attempted first-degree murder. He repeatedly told jurors that once he established a common design to commit armed robbery, the law imposed criminal responsibility for the attempted murders, regardless of the defendant's state of mind. The defendant asks us to grant a new trial because of this submission of damning misinformation.

The second part of the defendant's first argument completely reverses position on the state of the law. The defendant maintains that his lawyer was constitutionally deficient for pursuing a baseless defense premised upon the exact view of criminal responsibility that underlies his prior request for a reversal or a new trial. He argues that his attorney pursued a course doomed to failure because the State has no burden to prove a shared specific intent to kill when holding one armed robber accountable for a cohort's effort to kill robbery victims. He contends that his lawyer possessed a misguided view of the law that resulted in an ill-conceived defense fashioned in such a manner that counsel virtually conceded guilt.

■ The first part of the defendant's argument must yield to the second, for only the second part is based upon an accurate statement of our law of accountability. Notwithstanding the *dicta* set forth in *People v. Stanciel*, criminal responsibility in Illinois is well settled. "[W]here two or more persons engage in a common criminal design or agreement, *any* acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts ***." (Emphasis added.) *People v. Kessler*, 57 Ill. 2d 493, 496-97, 315 N.E.2d 29, 32 (1974); accord *People v. Batchelor*, 171 Ill. 2d 367, 375-76, 665 N.E.2d 777, 780-81 (1996). The defendant did not have to share Pickens' specific intent to kill in order to be held accountable for attempted murder.

We turn to the question of whether the defendant was denied the effective assistance of counsel because his lawyer fashioned a defense that lacked any legal efficacy.

■ The defendant asks us to forego an examination of trial counsel's representation under the well-settled, two-part standard of review established by the United States Supreme Court for sixth amendment ineffective-assistance-of-counsel claims. U.S. Const., amend. VI; *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 473

N.E.2d 1246 (1984). We customarily review claims of substandard lawyering under a test that requires a defendant to demonstrate more than deficiencies or failures in how his defense counsel performed. In order to obtain relief from a lawyer's substandard legal assistance, the defendant must also show that in the absence of defense counsel's professional errors, a different trial outcome was reasonably probable. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Thus, the defendant's request that we test counsel's performance under a different standard is critical to his argument. He cannot begin to argue that but for counsel's professional errors, a likelihood existed that the outcome would have been different. With the insurmountable amount of evidence that the defendant provided to the State, it is hard to imagine how the outcome in this case would ever change, no matter how well defense counsel performed.

The law recognizes that in rare cases, defense counsel will provide legal assistance so flawed that it is tantamount to no assistance at all. Where the legal assistance provided to an accused fails to meaningfully test the State's case, the adversarial process that underlies sixth amendment rights is rendered unreliable, and trial's outcome under that circumstance violates the constitution. *United States v. Cronic*, 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (1984). When the State's case has not survived the crucible of a meaningful adversarial test, the defendant need not show how counsel's deficiencies produced prejudice. *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.

We review what happened here under the latter standard and decide whether defense counsel performed so poorly that his performance resulted in an utter breakdown of the adversarial process. We do so mindful of an obvious concern that accompanies claims like the one raised here, claims that defense counsel completely failed to subject the State's case to a meaningful adversarial test. Some cases do not afford much with which the defendant's lawyer can work, regardless of his or her skill and training. Nonetheless, as long as a defendant chooses to persist in a not-guilty plea, even in the face of insurmountable evidence, counsel is obligated to pursue a defense consistent with his client's innocence. See *People v. Dodson*, 331 Ill. App. 3d 187, 771 N.E.2d 586 (2002). Defending clients who have left a trail of evidence that makes guilt obvious can be a daunting task. Often the relationship between counsel and client becomes strained when the client shuns sound advice to enter a guilty plea and show some contrition in an effort to mitigate punishment. Any strategy engaged in under that circumstance deserves to be weighed in light of what the defense attorney confronted. When we decide whether

counsel provided a meaningful adversarial test of the State's case, we must necessarily judge efforts to defend the indefensible with a tolerance for the word "meaningful." The more undeniable the defendant's guilt, the more tolerant we need to become.

Here, trial counsel for the defendant employed the defendant's self-serving statements to build a defense grounded in the claim that the State could not prove that he shared guilt for everything that Pickens did. The entire defense hinged upon convincing the jury that the defendant did not plan to shoot the armed robbery victims, did not expect a shooting to occur, and had completed his sole criminal objective before any shooting started. Defense counsel tried to convince the jury that it was reasonable to doubt the defendant's shared guilt for acts which he did not anticipate, did not commit, and did not condone. This effort to persuade was engaged in under well-settled law that assigns criminal responsibility for any act done in furtherance of a planned criminal objective and as a part of a common criminal design. *Kessler*, 57 Ill. 2d at 499, 315 N.E.2d at 33.

In *People v. Chandler*, 129 Ill. 2d 233, 543 N.E.2d 1290 (1989), the Illinois Supreme Court confronted an ineffective-assistance-of-counsel claim analogous to the one raised here. Defense counsel conceded his client's involvement in a residential burglary but argued that his client could not be found guilty of the murder that his accomplice committed during the burglary. *Chandler*, 129 Ill. 2d at 241, 543 N.E.2d at 1292. The felony-murder doctrine, as interpreted under Illinois law, was completely at odds with the tendered defense. See *People v. Hickman*, 59 Ill. 2d 89, 319 N.E.2d 511 (1974). The supreme court reversed Chandler's conviction, noting:

> "Although defense counsel was faced with a difficult case, his performance was clearly deficient. Counsel chose not to cross-examine several key prosecution witnesses ***. Counsel's cross-examination of other witnesses was extremely cursory. Moreover, he called no witnesses to testify, not even defendant, despite his assertion in his opening statement that defendant would testify and tell the jury what he did and did not do. By failing to comprehend the law of accountability and felony murder, counsel's strategy and actions amounted to no real defense at all. The prosecution's case, therefore, was not subject to meaningful adversarial testing, and defendant was deprived of a fair trial." *Chandler*, 129 Ill. 2d at 248-49, 543 N.E.2d at 1296.

The defendant thinks that *People v. Chandler* is so akin to the present case that it compels a reversal. We think that the lawyer's actions in that case and the lawyer's actions here are worlds apart.

■ We have reviewed the entire common law record and the

proceedings at the trial in this matter. That review demonstrates an attorney doing everything legally possible to shield his client from the State's goals, despite a hopeless set of circumstances. Counsel's pretrial lawyering was relentless. He filed a motion to substitute the first judge assigned to the case. He filed a motion to disqualify the assistant State's Attorney assigned to prosecute the case. He filed a motion for an expert witness. He filed a motion for discovery sanctions. Furthermore, he filed no less than eight motions aimed at either suppressing evidence or excluding evidence. During the trial, his cross-examination of State witnesses was always aggressive and vigorous. Indeed, given the nature of the defense, his aggressive attack of the police officers' and the victims' credibility appeared somewhat ill-conceived. While a few things counsel did could be second-guessed, there is one thing for which we could never fault him—lack of effort. This record presents the antithesis of the surrender and capitulation we discussed in *People v. Dodson*, where we found that counsel failed to provide a meaningful adversarial test of the State's case. *Dodson*, 331 Ill. App. 3d 187, 771 N.E.2d 586.

More importantly, we think that counsel chose the correct, and only, path of defense left open to him. It was a course dictated by Angela's and Rosario's survival and the hot pursuit that it provided. The defendant was virtually caught in the act of committing the crime. Defense counsel confronted an obvious and undeniable truth that his client had committed armed robbery. The defendant admitted in writing that he had committed armed robbery. Two eyewitnesses appeared from the edge of darkness to confirm the truth in that admission. Police officers who chased him down after a desperate flight for freedom, who pulled him from the wreckage that was once a dealership car, who found dealership money on him and his accomplice, and who found both armed robbery weapons jettisoned during the chase spoke further of his unquestionable guilt. It understates the strength of the State's case to call the evidence of guilt overwhelming. No reasonable person could possibly have doubted it. Defense counsel astutely confronted this reality and dealt with it as best he could.

Furthermore, the defendant is simply wrong when he maintains that his lawyer's stance was at odds with the law of accountability in this state. Unlike the defense attorney in *People v. Chandler*, this attorney knew how the law of accountability functioned, and he fashioned his defense to comport with it. He understood that the accountability statute would assign criminal responsibility for Pickens' acts, if done in furtherance of the armed robbery and as a part of a common criminal design to commit that crime. Counsel demonstrated awareness of the fact that the efficacy of the defendant's claims

depended upon convincing the jury that the agreed-upon armed robbery was completed before any shootings occurred. When he emphasized his client's claims, a lack of intent to kill or hurt anyone, and coupled them to a lack of actual participation in the shootings, counsel knew how they would prove germane to the inquiry. He had to persuade the jury that the common criminal venture was over, its objectives having been achieved, before the shooting started.

Defense counsel tried to convince the jury not only that the defendant was a nonparticipant in the shootings but that his responsibility for them ended with the completion of his sole criminal objective. He reminded the jurors that the law only assigns criminal responsibility for another's acts if aid and assistance is given either before or during the commission of the crime. He then maintained that leaving the car dealership and driving the getaway car was assistance rendered after the armed robbery was complete. It was not an act that would allow the shootings to be considered a part of the armed robbery.

To be sure, the defense was factually imperfect. Pickens and the defendant could hardly drive off in a dealership car without furthering the ongoing objective of robbery. The common design was incomplete, and still in play, when the shootings occurred. This factual deficiency in the defense does not allow us to conclude that the defense was tantamount to no defense at all. Defense counsel offered the jury a construction of the facts that would allow it to return favorable verdicts. Jurors who believed the defendant's claims that he did not buy into murder, and who were hesitant to assign guilt for serious crimes in which he did not actually engage, were given a way to reach a verdict of not guilty. The fact that they correctly rejected the notion that the car was effectively taken, and the robbery was complete, when the car keys were selected and in the defendant's possession only confirms how hard a case this was to defend. It does not mean that counsel failed to subject the State's case to an adversarial test that was meaningful.

The defendant was not deprived of his constitutional right to the effective assistance of counsel.

■ Next, the defendant argues that the trial judge committed reversible error when he ruled that the State could impeach with a prior armed robbery conviction, should the defendant choose to testify in the case.

Initially, we note that this case offers one of those rare instances where concern over a prior conviction sending the wrong message is reduced. The defendant was conceding participation in an armed robbery. His propensity for committing armed robbery was not going to

be used to convict him of that crime. To the extent that the prior armed robbery was committed without injury to its victims, the prior criminality may well have proven beneficial. It may have demonstrated that the defendant lacked a penchant for the kind of violence in which his cohort engaged.

In any event, there is no way for us to find error in the trial judge's ruling. Since the defendant did not testify, he failed to provide us with a record to review. As the supreme court has noted:

"[D]efense counsel may not have it both ways by altering their trial strategy to make the best of the trial court's order, depriving the reviewing court of a reviewable record, and still maintain that the order was erroneously entered." *People v. Whitehead*, 116 Ill. 2d 425, 443-44, 508 N.E.2d 687, 693 (1987).

Since we have nothing to weigh in order to decide how the trial judge's ruling produced harm, we have no basis to afford the requested relief.

■ Finally, the defendant challenges his sentence to natural-life imprisonment as a habitual criminal, contending that the State failed to prove the existence of the requisite Class X felony convictions.

In order for the court to sentence an individual as a habitual offender, it must first find that the statutory criteria have been met. The statute reads, in pertinent part:

"Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony, criminal sexual assault, aggravated kidnapping[,] or first[-]degree murder[ ] and is thereafter convicted of a Class X felony, criminal sexual assault[,] or first[-]degree murder, committed after the 2 prior convictions, shall be adjudged [a] habitual criminal." 720 ILCS 5/33B—1(a) (West 1998).

The question of whether the requirements set forth in this provision were satisfied in this case turns upon the meaning of the defendant's 1981 Illinois conviction for rape, the first of two prior convictions tendered by the State to meet the statutory criteria. The defendant maintains that the State's proof failed because such a conviction then could have rested upon sexual misconduct as benign as the misconduct that now underlies the offense of criminal sexual abuse, a misdemeanor. According to the defendant, the State's tender of the earlier rape conviction left room for doubt about its classification and, hence, its ability to serve as one of the two requisite prior convictions necessary to impose a life sentence.

In 1984, our legislature enacted Public Act 83—1067, more commonly known as the Criminal Sexual Assault Act (Pub. Act 83—1067, eff. July 1, 1984). It repealed eight statutes that had previously defined

sex offenses under the Criminal Code of 1961. The criminal offense of rape was repealed with that enactment.

The Criminal Sexual Assault Act "recodif[ied] the sexual offenses into a comprehensive statute with uniform statutory elements that would criminalize all sexual assaults without distinguishing between the sex of the offender or the victim and the type of sexual act proscribed." *People v. Haywood*, 118 Ill. 2d 263, 271, 515 N.E.2d 45, 49 (1987). Here, we are called upon to decipher which of the redefined sex offenses enacted in 1984 were intended by our legislature to supplant the offense of rape.

The task of determining the legislature's intent has been made simple by our supreme court. In *In re Detention of Lieberman*, 201 Ill. 2d 300 (2002), the high court weighed into whether the offense of rape, a crime not included as a sexually violent offense under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 1998)), nonetheless constituted a crime that qualified a person for commitment as a sexually violent person. *In re Detention of Lieberman*, 201 Ill. 2d at 312-14. In so doing, the court concluded that the legislature intended that the offenses of criminal sexual assault and aggravated criminal sexual assault created by the Criminal Sexual Assault Act subsume the offense of rape. *In re Detention of Lieberman*, 201 Ill. 2d at 313-14.

The conclusion reached by our supreme court resolves the question raised here. Contrary to the defendant's assertion, a 1981 conviction for rape could not have involved criminal conduct other than what today would constitute either criminal sexual assault or aggravated criminal sexual assault, both of which are predicate offenses under the habitual criminal sentencing scheme. A closer examination of what the State presented demonstrates that this was in fact the case. The charging document under which the defendant was convicted in 1981 alleged the use of force, a necessary element of the crime of rape. The use of force is the element that separates today's offenses of criminal sexual assault and aggravated criminal sexual assault from less egregious sex offenses, the conviction of which would not qualify for use in pursuit of habitual criminal status.

We conclude that the trial judge correctly determined, based upon sufficient proof from the State, that the defendant had the three strikes necessary to be sentenced as a habitual criminal. We uphold the life-imprisonment term that the trial judge imposed.

For the reasons stated, the defendant's convictions and sentences are affirmed.

Affirmed.

WELCH and GOLDENHERSH, JJ., concur.