THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALLEN BLOOMINGBURG, Defendant-Appellant.

First District (2nd Division)    No. 1—02—2359

Opinion filed February 3, 2004.

Michael J. Pelletier and Letty S. DiGiulio, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

Following a bench trial, defendant Allen Bloomingburg was found guilty of first degree murder and sentenced to 60 years' imprisonment. On appeal, defendant contends that his trial counsel was ineffective because he conceded defendant's guilt and pursued an unavailable theory of self-defense, thus leaving the trial court with no alternative but to find him guilty of first degree murder. Defendant also contends that the mandatory "15/20/25-to-life" sentencing scheme added to the sentencing statute (730 ILCS 5/5—8—1(a)(1)(d) (West 2000)) by Public Act 91—404 (Pub. Act 91—404, eff. January 1, 2000), based on the use of a firearm during the course of an offense (hereinafter referred to as the firearm-enhancement provision), violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and constitutes double enhancement of the offense of first degree murder and his sentence. Defendant further contends the mittimus must be corrected to reflect the correct amount of pretrial credit defendant was owed. For the reasons set forth below, we affirm and order correction of the mittimus.

## STATEMENT OF FACTS

Defendant was indicted on six counts of first degree murder for shooting and killing Levell Applewhite on August 29, 2000, at 3:30 a.m. At the time of the shooting, defendant was 19 years old and was a member of the Traveling Vice Lords street gang. Defendant was arrested for the shooting, at his home, without a warrant on September 2.

Prior to trial, defendant's attorney filed a motion to dismiss the indictment on the basis of double enhancement with respect to the

firearm-enhancement provision.[1] Counsel also filed a motion to suppress defendant's confession on the basis that it was induced and coerced. Similarly, counsel filed a motion to quash arrest and suppress evidence on the basis that defendant's arrest violated the fourth amendment in that no arrest or search warrant had been issued. A hearing was held on the latter two motions on July 13, 2001. The trial court denied defendant's motion to quash arrest and suppress evidence, concluding that the police had probable cause to arrest defendant. The court then heard argument on defendant's motion to suppress his confession on the ground of involuntariness. Defense counsel argued that the police intimidated defendant until he confessed and, therefore, his confession was a product of coercion. The trial court dismissed this motion, stating that the allegations were insufficient to rise to the level of any constitutional violation.

Thereafter, defendant filed his answer to pretrial discovery, denying all of the allegations against him. Defendant stated that he would assert self-defense and the defense of others as a defense to the charges. On November 26, defendant waived a jury trial and his bench trial began the next day.

Defendant's counsel began his opening argument as follows:

"Your Honor, on August 29th in the early morning hours of the year two thousand, Mr. Bloomingburg did see Levell Applewhite known as Bishop out on the street and at that time he did go get the gang's gun, and he did go down, and he did shoot Mr. Bishop in the head.

It was not as a result of gang rivalries, drugs, or anything else. What it was is that Mr. Bloomingburg had heard from various individuals, his sister and a Lawanda Pettis, that Bishop bragged about shooting his brother, Willie, and he also made statements that he's going to kill Allen."

Counsel then stated that a few days prior to the shooting, defendant was walking on the street when a car owned or driven by Applewhite drove by defendant, at which time a shot was fired from the car at him. According to counsel, this incident, coupled with Applewhite's previous threats against defendant, made defendant shoot Applewhite. Counsel then stated:

"It is a case where he is justified. He may be guilty of shooting him—or that's a poor phrase. He may have shot him, but he is not guilty of first degree murder."

John Blakey, a former assistant State's Attorney, testified first on behalf of the State. On September 2, 2000, Blakey took statements from several eyewitnesses to the shooting and then spoke with

---

[1]There is no evidence in the record that this motion was ever ruled upon.

defendant. At approximately 12:15 a.m. on September 3, Blakey had a conversation with defendant, during which defendant implicated himself and explained how he crept up and shot Applewhite. Following this conversation, Blakey asked if defendant would like to memorialize it, to which defendant responded in the affirmative. After hearing the alternatives for doing so, defendant chose to have his statement videotaped, which was done at approximately 3 a.m.

Defendant's videotaped statement was then played for the court. In this statement, defendant admitted that he had been a member of the Traveling Vice Lords since 1996 and that the gang sold drugs to make money. Defendant himself had sold drugs for the gang. Defendant further stated that the gang protects its territory with a gun and that members would shoot at someone who did not belong in the territory. Defendant then stated that Applewhite was not a Traveling Vice Lords gang member and was not allowed to sell drugs in the territory. According to defendant, Applewhite had been told this and he was also told he could not hang out in the Traveling Vice Lords' territory even if he was not selling drugs. Defendant then stated that, in the past, Applewhite had shot defendant's brother, Willie, and had shot at, or been involved with, shooting at defendant. Defendant further stated that there was a dispute with Applewhite over selling drugs in the Traveling Vice Lords' territory and the only way to resolve the dispute was to shoot him.

Defendant then stated that on August 28, he had been selling drugs for the gang and was in possession of the gang's gun. At approximately 3:30 a.m., defendant was in an apartment building, smoking marijuana and drinking with three other males and four females. According to defendant, he had been looking out a window, watching for Applewhite. Defendant saw Applewhite drive up in front of the building. Defendant retrieved the gang's gun, walked through the alley, stopped at the corner, and pulled out the gun and held it to his side. Defendant then ran up to Applewhite's car, pointed the gun at Applewhite's head, approximately one foot away, and shot him, "like pow." Defendant then returned to the apartment building and hid the gun. Defendant spoke with his brother Willie the next day, telling him that he had shot Applewhite. When Willie asked him why, defendant told Willie it was because Applewhite had shot Willie and because Applewhite was not supposed to be in the area.

On cross-examination, Blakey admitted that defendant had not stated he had gone looking for Applewhite, just that he was watching for him. In addition, defendant did not state that the gang had ordered him to shoot Applewhite. Blakey also admitted that he had not asked defendant, in the videotape, in exact words, why he had shot Apple-

white, but that he had asked defendant the question during their oral conversation.

Nephtali Gonzalez next testified on behalf of the State. According to Gonzalez, at approximately 3:15 a.m. on August 29, he awoke and discovered that his fiancée, Dawn Bedell, was not home. Gonzalez decided to look for her and went outside their apartment to see if she was in the area. Gonzalez observed Bedell in a car with Applewhite and Carla Robinson. Thereafter, as Bedell was handing Gonzalez her schoolbooks so she could exit the car, Gonzalez heard a pop and saw a flash. Gonzalez looked up and saw defendant. Gonzalez then identified defendant in court. Gonzalez further testified that after Bedell got out of the car, he and she went to their apartment and called 911. Gonzalez spoke to the police when they arrived on the scene, telling them what had occurred. On September 2, Gonzalez viewed a lineup and identified defendant as the person who shot Applewhite. Defense counsel did not cross-examine Gonzalez.

Dawn Bedell then testified on behalf of the State. Her testimony mirrored Gonzalez's. Defense counsel did not cross-examine Bedell.

Detective Robert Jellen then testified on behalf of the State. Jellen stated that he was assigned to investigate Applewhite's murder. According to Jellen, when he spoke with defendant on September 2, defendant stated that the motive for shooting Applewhite was drugs, that Applewhite was not supposed to be in the area, and that Applewhite had shot his brother. Jellen denied that defendant ever stated he shot Applewhite because he was afraid of him or had been threatened by him.

On cross-examination, Jellen admitted that the first time he spoke with defendant, defendant denied shooting Applewhite. However, when defendant was advised that he had been identified, he then admitted his involvement. Defendant also told Jellen that his brother Willie had been shot because of a feud over drugs, he believed Applewhite was behind his brother's shooting and, approximately one week before he shot Applewhite, he was shot at and he believed Applewhite was involved. Jellen then admitted that there was nothing in his report indicating that defendant had stated he shot Applewhite because of a drug feud.

The State then rested. Thereafter, defendant's motion for a directed finding was denied.

Defendant then testified on his own behalf. Defendant stated that his brother had been shot sometime in 2000. A few days prior to Applewhite's shooting, defendant had been shot at and he believed Applewhite was involved. Defendant further testified that he spoke with his sister sometime prior to the shooting and she told him that Apple-

white threatened to kill him when he saw him. According to defendant, when he was told this, he was afraid and in fear for his own life because Applewhite was known for shooting people. Defendant's sister also told him that Applewhite had shot Willie. Defendant then testified, consistent with his videotaped statement, as to the events that evening. Defendant admitted that Applewhite had not threatened him at the time and that he did not see Applewhite in possession of a weapon. Defendant stated, however, that he shot Applewhite "because he was going to kill me if I wouldn't have killed him."

On cross-examination, defendant admitted that he shot and killed Applewhite after he snuck up on him. Defendant denied shooting Applewhite because of drug feuds. The assistant State's Attorney then began reading portions of defendant's statement to the police and defense counsel objected, arguing that the words used were those of the assistant State's Attorney taking the statement, not defendant's. Defendant then testified that he did not remember answering in the statement that he had shot Applewhite because of a drug dispute. Defendant also again denied that he shot Applewhite because of drugs.

On redirect examination, defendant admitted that there was a dispute between him and the Traveling Vice Lords with Applewhite for shooting defendant's brother. Defendant further testified that during his videotaped statement, he was only allowed to answer the questions asked and was not allowed to volunteer or add any additional information.

Anita Bloomingburg, defendant's sister, then testified on defendant's behalf. She stated that she knew Applewhite and, sometime prior to August 29, she had spoken with Applewhite. At this time, Applewhite said he had shot Willie, who was not dead, but that Allen (defendant) "won't be so lucky." Anita told defendant about this conversation.

Defense counsel then offered Applewhite's two prior convictions, one for aggravated discharge of a firearm at five girls. The court allowed the offer and defendant rested. In rebuttal, the State offered defendant's July 27, 2000, conviction for possession of a controlled substance with intent to deliver. The parties then gave their closing arguments. Defense counsel argued that the question before the court was not who did the shooting, but why, and that involved defendant's state of mind. Accordingly, counsel argued that the court should find defendant not guilty of first degree murder.

Thereafter, the court rendered its ruling. The court found, after hearing all the evidence, as follows: ·

"The evidence essentially through the testimony of Dawn Bedell and Nephtali Gonzalez, plus the defendant's videotaped statement,

established all of the elements, including the absence of any justification on behalf of Mr. Bloomingburg.

The Defense theory rests upon the claim of lawful justification ***

***

That defendant, however, claims lawful justification because of events that transpired many months before, starting with the shooting of his brother, Little Willie, by Mr. Applewhite and culminating in shots directed at him from Applewhite's vehicle a week or so before the fatal shooting of Applewhite, and threats that were made by Applewhite to the defendant's sister and communicated to him.

***

Even—even accepting everything that the defendant has testified to, even accepting what his sister has testified to, in the Court's analysis, those articulations must be measured by the law as the Court understands it to be.

* * *

[Reciting Illinois cases on self-defense.]

Using these opinions as guideposts, it is readily apparent that the elements of justifiable use of force are utterly lacking in this case. Assuming the veracity of the prior threats attributed to Mr. Applewhite, what occurred here is that Mr. Bloomingburg simply took the law in his own hands. He left the place of safety. He put himself into a position of peril, if indeed he really believed that Mr. Applewhite was seeking to inflict harm upon him.

He placed himself into that affray by silently creeping up on the victim as he sat in the car with his back towards Mr. Bloomingburg.

There was no imminent danger of harm to Bloomingburg on the day of this occurrence. Whether there was ever a danger of harm to him is not the subject of consideration by this Court because it does not amount to justifiable use of force. The defendant clearly and simply was the aggressor here on the date in question.

***

There was no justifiable use of force here, and there was certainly no justification under the law of the State of Illinois. This defendant by his own testimony personally discharged this firearm."

Accordingly, the court found defendant guilty of first degree murder. Thereafter, defendant filed a motion for a new trial and arrest of judgment, arguing that there was sufficient evidence to reduce his conviction from first degree to second degree murder, the trial court erred in overruling certain objections made by his counsel, the trial court erred in granting the State's motion to dismiss, without an evidentiary

hearing, his motion to suppress his confession, the trial court erred in denying his motion to dismiss the indictment, and the trial court erred in denying his motion to quash arrest and suppress evidence. The trial court subsequently denied defendant's motion for a new trial and arrest of judgment.

Defendant's sentencing hearing was continued for a period of time while the trial court was awaiting a decision from our supreme court with respect to the constitutionality of the firearm enhancement provision. Defendant was finally sentenced on July 15, 2002, to 35 years' imprisonment for murder plus 25 years pursuant to the firearm-enhancement provision, totaling 60 years' imprisonment. This appeal followed.

## ANALYSIS

### I. Ineffective Assistance of Counsel

Defendant first contends that his trial counsel was ineffective because he completely and unequivocally conceded defendant's guilt in his opening statement and then presented a defense, self-defense, that was unavailable to defendant since defendant was the aggressor and was not in imminent danger of great bodily harm or death. According to defendant, counsel's conduct amounted to no representation at all and failed to subject the State's case to meaningful adversarial testing and, thus, left the trial court no choice but to convict him, therefore prejudicing him. In this regard, defendant argues that his counsel's conduct prevented him from being able to make an intelligent decision whether to plead not guilty, whether to waive a jury trial, and whether to testify. Defendant also maintains that our standard of review is *de novo* because the question of ineffective assistance of counsel involves a question of law. According to defendant, the *Strickland* test (*Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984)) is not a standard of review but, rather, defines a defendant's legal burden of proof.

■ The law is well settled with respect to ineffective assistance of counsel claims. In *People v. Jones*, 322 Ill. App. 3d 675, 749 N.E.2d 1021 (2001), this court stated:

"Claims of ineffective assistance of counsel based on deficient representation of a criminal defendant are evaluated in accordance with the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984) ***. Under *Strickland*, defendant must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness; and that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. [Citations.] As to the first prong, judicial scrutiny of counsel's performance is highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. [Citations.]" *Jones*, 322 Ill. App. 3d at 678-79.

A defendant also must show that his attorney's deficiencies so prejudiced him as to deprive him of a fair trial with a reliable result. *People v. Spann*, 332 Ill. App. 3d 425, 430, 773 N.E.2d 59 (2002). A reviewing court need not decide whether counsel's performance is deficient if the ineffective assistance of counsel claim can be disposed of on the ground that the defendant did not suffer prejudice. *Jones*, 322 Ill. App. 3d at 679.

■ An exception to *Strickland* exists in a narrow class of cases. "Where counsel *entirely fails* to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of sixth amendment rights that makes the adversary process itself presumptively unreliable" and the defendant need not demonstrate actual prejudice *(Cronic/Hattery* standard). (Emphasis added.) *Jones*, 322 Ill. App. 3d at 680; *United States v. Cronic*, 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047 (1984); *People v. Hattery*, 109 Ill. 2d 449, 461, 488 N.E.2d 513, 517 (1985). Concession of the defendant's guilt, however, is not *per se* ineffective assistance of counsel so as to avoid application of the *Strickland* standard. *People v. Johnson*, 128 Ill. 2d 253, 270, 538 N.E.2d 1118 (1989); *People v. Reed*, 298 Ill. App. 3d 285, 301, 698 N.E.2d 620 (1998); *People v. Elam*, 294 Ill. App. 3d 313, 320, 689 N.E.2d 662 (1998). Prejudice is only presumed when "defense counsel has unequivocally conceded every significant aspect of the defendant's guilt." *People v. Abt*, 269 Ill. App. 3d 831, 839, 646 N.E.2d 1341 (1995); *People v. Lindsay*, 263 Ill. App. 3d 523, 532, 635 N.E.2d 551 (1994). In other words, "a defendant must still meet the *Strickland* test unless the case involves a complete failure to subject the State's case to meaningful adversarial testing." *People v. Nieves*, 192 Ill. 2d 487, 500, 737 N.E.2d 150 (2000).

Initially, we note that we need not decide whether the *Strickland* test is a standard of review or burden of proof, as defendant argues. The law is well settled that the *Strickland* test applies to our review and analysis of defendant's ineffective assistance of counsel claim. See *People v. Callahan*, 334 Ill. App. 3d 636, 641, 778 N.E.2d 737 (2002); *People v. Madison*, 334 Ill. App. 3d 680, 685-87, 778 N.E.2d 376 (2002); *People v. Cundiff*, 322 Ill. App. 3d 426, 434-35, 749 N.E.2d 1090 (2001); *People v. Blankley*, 319 Ill. App. 3d 996, 1004, 747 N.E.2d 16 (2001);

*People v. Owens*, 269 Ill. App. 3d 152, 159, 645 N.E.2d 483 (1994); *People v. Liles*, 232 Ill. App. 3d 433, 444, 597 N.E.2d 735 (1992); *People v. Phillips*, 227 Ill. App. 3d 581, 586, 592 N.E.2d 233 (1992).

Defendant argues that the *Cronic/Hattery* standard is applicable in the instant case. We do not agree. The instant case is clearly distinguishable from *Hattery*. In *Hattery*, defense counsel unequivocally conceded the defendant's guilt in his opening argument, advanced no defense theory, introduced no evidence at trial, made no closing argument, and, therefore, made no attempt to hold the State to its burden of proof. Here, defendant's attorney did advance a defense theory. Whether right or wrong, he presented evidence on defendant's behalf, cross-examined most of the State's witnesses, and objected to adverse evidence against defendant. Thereafter, counsel made a closing argument in which he argued that the evidence demonstrated that defendant should not be convicted of first degree murder. Clearly, counsel made an effort to hold the State to its burden of proof and to require it to prove its case of first degree murder against defendant. In addition, counsel filed several pretrial motions, including a motion to dismiss the indictment on the basis of double enhancement. Counsel also filed a motion to suppress defendant's confession and quash arrest and suppress evidence. While defendant argues that the filing of these motions further demonstrates counsel's deficiencies because they show he did not know the correct law, we do not agree. The motions demonstrate that counsel was requiring the State to prove defendant's arrest was legal and his confession was proper. Clearly, counsel probed the State's case, from the very beginning, for weaknesses unlike counsel in *Hattery*.

We further find that defense counsel's conduct in the instant case did not constitute a "'total failure' of legal representation" (*People v. Wiley*, 165 Ill. 2d 259, 291, 651 N.E.2d 189 (1995)), but, rather, his conduct demonstrated an attempt to present a defense, albeit unsuccessfully, and to test the State's case against defendant. Defendant's counsel did in fact act as an adversary on defendant's behalf. Here, as our supreme court stated in *People v. Shatner*, 174 Ill. 2d 133, 673 N.E.2d 258 (1996), we find that "[i]t is untenable to suggest that the proceedings below approached the adversarial breakdown of the *Hattery* proceedings, where defense counsel acted not as an advocate for the accused but as a proponent for the prosecution." *Shatner*, 174 Ill. 2d at 146. See also *Nieves*, 192 Ill. 2d at 495 (finding that the *Strickland* standard applied where defense counsel "extensively cross-examined State's witnesses, called a witness in support of his theory of defense, and forcefully argued that defendant should be found 'not guilty'"). Accordingly, we conclude that the *Strickland*, not the *Cronic/Hattery*, standard is applicable to the instant case.

Under the facts of the case here, we find that defendant cannot meet the *Strickland* test. Although defendant argues that the facts of the instant case are similar to *People v. Chandler*, 129 Ill. 2d 233, 543 N.E.2d 1290 (1989), and *People v. Torres*, 209 Ill. App. 3d 314, 568 N.E.2d 157 (1991), they are not and we need not discuss these cases in light of the cases that are on all fours with the instant case, as discussed below.

*Nieves* is directly on point with the instant case, particularly since there the defendant's attorney argued a defense that was not, and would never be, available to the defendant. In *Nieves*, the defendant was convicted of first degree murder following a jury trial. *Nieves*, 192 Ill. 2d at 490. On appeal, the defendant argued that his counsel was ineffective because counsel presented an invalid " 'mercy-killing' " defense (*Nieves*, 192 Ill. 2d at 490), *i.e.*, that the defendant killed the victim because the victim wanted to die (*Nieves*, 192 Ill. 2d at 492). Specifically, the defendant argued that " 'mercy killing' [was] not a defense to first degree murder and that his attorney improperly conceded his guilt to the jury," thereby rendering ineffective assistance of counsel. *Nieves*, 192 Ill. 2d at 494. The *Nieves* court first noted that *Strickland* governed, not *Hattery*. *Nieves*, 192 Ill. 2d at 495. The defendant in *Nieves*, like defendant here, relied principally on *Chandler*. *Nieves*, 192 Ill. 2d at 495.

The *Nieves* court then further noted that the *Chandler* court, applying the *Strickland* standard, concluded that the defendant had received ineffective assistance of counsel because defense counsel presented no witnesses, although he had promised the jury in his opening argument that the defendant would testify, counsel in both opening and closing arguments conceded that the defendant was involved in the crime although he argued that the defendant was not guilty of murder, and counsel failed to develop any theory of innocence on behalf of the defendant. *Chandler*, 129 Ill. 2d at 246-47. According to *the Chandler* court, the concessions by the defendant's attorney amounted to a concession of guilt and resulted in ineffective assistance. *Chandler*, 129 Ill. 2d at 248.

The *Nieves* court next noted that, since *Chandler*, the issue of conceding a defendant's guilt had been "revisited" several times in *People v. Ganus*, 148 Ill. 2d 466, 594 N.E.2d 211 (1992), *People v. Page*, 155 Ill. 2d 232, 614 N.E.2d 1160 (1993), and *Shatner*, and then proceeded to discuss these cases. In *Ganus*, the defendant was convicted of murder. Although the defendant confessed to the crime, the defendant's attorney, through cross-examination of the State's witnesses, attempted to establish the defense of compulsion—a defense not available for first degree murder. *Ganus*, 148 Ill. 2d at 471-72. The

*Ganus* court concluded that the defendant did not satisfy either prong of *Strickland*, stating:

> "What the instant case presents is a situation where the defendant literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility. It is not inconceivable that a compulsion defense might have evoked empathy, compassion or understanding and sympathy in the minds of the jurors. It is a truism that if a man is drowning, he will grasp at a straw that comes floating by. A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense. In this case it would appear that defense counsel used his imagination and resourcefulness to come up with something where he had nothing to go on." *Ganus*, 148 Ill. 2d at 473-74.

In *Page*, the court also concluded that the defendant's attorney did not render ineffective assistance of counsel. Even though the defendant's counsel conceded the defendant's guilt in his opening argument and, then, in closing argument, argued that the defendant did not intend to kill the victim, the *Page* court found that because there was very little evidence to support the proffered defenses in light of the overwhelming evidence of the defendant's participation in the killing, counsel might have reasonably believed that voluntary manslaughter was the only reasonable course of defense. *Page*, 155 Ill. 2d at 262.

In *Shatner*, the defendant admitted that he was involved in a robbery, but he placed the blame for the murder of the victim on other participants. *Shatner*, 174 Ill. 2d at 148. The *Shatner* court concluded that the defendant's counsel was not ineffective even though he conceded the defendant's guilt, since he aggressively cross-examined nearly every witness and called several witnesses on the defendant's behalf and it was the defendant's own confession that undermined any claim of innocence the defendant had. *Shatner*, 174 Ill. 2d at 147-48. According to the *Shatner* court, although the defendant's counsel's hope of convincing the jury that the defendant was only guilty of robbery (and not murder) was risky, it was perhaps the only strategy that could have been pursued by the defendant's counsel given the defendant's confession and the overwhelming evidence of the defendant's guilt. In this regard, the *Shatner* court stated:

> "If a defendant enters a not-guilty plea in the face of overwhelming evidence of his guilt, we are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant's behalf. To do so would effectively require defense attorneys to engage in fabrication or subterfuge." *Shatner*, 174 Ill. 2d at 148.

Relying on the above authorities, the *Nieves* court concluded that the defendant could not meet either prong of *Strickland*. *Nieves*, 192 Ill. 2d at 498. The court noted that defense counsel's defense was based on the argument that sudden and intense passion did not necessarily need to be viewed in terms of anger and violence; rather, it could be "viewed in terms of sympathy and the desire to help a friend." *Nieves*, 192 Ill. 2d at 498-99. The *Nieves* court found that "[w]hile this is a dubious proposition at best ***[,] the defendant had confessed to the crime, and his attorney was trying to come up with something where his client had no defense." *Nieves*, 192 Ill. 2d at 499. Additionally, according to the *Nieves* court, "defendant's attorney thoroughly cross-examined the State's witnesses, presented a witness in support of his defense, and vigorously argued that the defendant should be found 'not guilty.' " *Nieves*, 192 Ill. 2d at 499. The *Nieves* court then stated:

"Moreover, we cannot find that a reasonable probability exists that, had counsel not pursued the invalid mercy killing strategy, defendant would have been acquitted. The evidence against defendant was overwhelming. Defendant gave a detailed confession to the crime, and the physical evidence corroborated his account of the crime." *Nieves*, 192 Ill. 2d at 499.

Ultimately, the *Nieves* court concluded that the defendant failed to show that his counsel's performance fell below an objective standard and failed to show that a reasonable probability existed that if counsel had not acted as he did, the outcome would have been different. *Nieves*, 192 Ill. 2d at 501.

*Nieves* and *Ganus* are on all fours with the instant case. As in *Nieves* and *Ganus*, defendant's attorney here argued a defense that was unavailable to defendant. In fact, the defenses argued in *Nieves* and *Ganus* were not even valid legal defenses to murder. Here, at least, self-defense is a valid and available defense to murder. Also, as in both *Nieves* and *Ganus*, defendant here had no defense and the evidence against him was overwhelming. Defendant confessed, both in a videotaped statement and in his testimony at trial, to shooting Applewhite. Moreover, two eyewitnesses testified regarding the incident and positively identified defendant as the shooter. Accordingly, as in *Ganus*, it appears that defense counsel "used his imagination and resourcefulness to come up with something where he had nothing to go on." *Ganus*, 148 Ill. 2d at 474.

Based on *Nieves* and *Ganus*, we therefore find that defendant's attorney did not render ineffective assistance of counsel.

## II. Firearm-Enhancement Provision

### A. Proportionate Penalties Clause

Defendant next contends that the firearm-enhancement provision, set forth in section 5—8—1(a)(1)(d) (730 ILCS 5/5—8—1(a)(1)(d) (West 2000)) of the Unified Code of Corrections, violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it punishes more severely those murders caused by firearms than those murders committed by other means.

■ The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In evaluating whether a proportionate penalties violation has been established, the central question is whether the penalty at issue has been set by the legislature 'according to the seriousness of the offense.' [Citations.]" *People v. Moss*, 206 Ill. 2d 503, 522, 795 N.E.2d 208 (2003). As stated by the court in *People v. Hill*, 199 Ill. 2d 440, 771 N.E.2d 374 (2002), there are three separate tests to identify a proportionate penalties violation:

> "First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.[2] Second, a penalty is invalid under the proportionate penalties clause where similar offenses are compared, and conduct that creates a less serious threat to the public health and safety is punished more severely.[3] Third, there is a violation of the proportionate penalties clause when identical offenses are given different sentences."[4] *Hill*, 199 Ill. 2d at 452.

Under the third test, relied upon by defendant here, "the elements of the respective offenses must be *identical* before the proportionate penalties clause will be implicated." (Emphasis in original.) *People v. Graves*, 207 Ill. 2d 478, 483 (2003).

Defendant maintains that the firearm-enhancement provision violates the third proportionate penalties test "because murder with a

---

[2]This test is applied when only a single offense is challenged. *People v. Davis*, 177 Ill. 2d 495, 502, 687 N.E.2d 24 (1997).

[3]This test is applied when two similar or related offenses are to be compared. *Davis*, 177 Ill. 2d at 502.

[4]This test is applied when comparing two identical offenses, *i.e.*, where the same conduct constitutes both offenses or when two different offenses have identical elements. *Davis*, 177 Ill. 2d at 503. See also *People v. Lewis*, 175 Ill. 2d 412, 423, 677 N.E.2d 830 (1996).

firearm \*\*\* is unconstitutionally disproportionate to the penalty for the identical offense of murder with another weapon." According to defendant, both offenses, murder by a firearm and murder by another means, "require proof at trial of the same substantive elements, [and, therefore,] their sentences should likewise be the same."

■ We do not find defendant's argument persuasive. The main problem with defendant's argument is that, under the third test, the elements of two different offenses must be compared. In other words, the court compares two offenses that contain or allegedly contain the identical elements. See *Graves*, 207 Ill. 2d at 483 (comparing unauthorized theft of over $20,000 from a victim over 60 years of age to theft by deception of $20,000 from a victim over 60 years of age and concluding the offenses did not contain identical elements); *People v. Espinoza*, 184 Ill. 2d 252, 259, 702 N.E.2d 1275 (1998) (comparing armed violence committed with a category I weapon to aggravated battery and concluding the offenses did not contain identical elements); *Davis*, 177 Ill. 2d at 504 (comparing Firearm Owners Identification Card Act offense (possession of a firearm without proper registration) to unlawful use of a weapon by a felon and concluding the two offenses did not contain identical elements); *Lewis*, 175 Ill. 2d at 418 (comparing armed robbery and armed violence predicated on robbery committed with a category I weapon and concluding that the offenses had substantially identical elements, thus violating the proportionate penalties clause); *People v. Christy*, 139 Ill. 2d 172, 181, 564 N.E.2d 770 (1990) (comparing aggravated kidnaping and armed violence and concluding the offenses contained identical elements, thus violating the proportionate penalties clause); *People v. Wade*, 131 Ill. 2d 370, 379-80, 546 N.E.2d 553 (1989) (comparing armed violence predicated upon intimidation with a category I weapon and attempted armed robbery and concluding the offenses did not contain identical elements); *People v. Wisslead*, 94 Ill. 2d 190, 194-96, 446 N.E.2d 512 (1983) (comparing armed violence predicated upon unlawful restraint with a category I weapon and aggravated kidnaping and concluding the offenses did not contain identical elements); *People v. Baker*, 341 Ill. App. 3d 1083, 1089-90, 794 N.E.2d 353 (2003) (comparing aggravated kidnaping and armed violence predicated upon kidnaping while carrying a category I weapon and concluding the offenses contained identical elements, thus violating the proportionate penalties clause); *People v. Townsend*, 275 Ill. App. 3d 413, 420, 654 N.E.2d 1096 (1995) (comparing aggravated discharge of a firearm with aggravated assault and concluding the offenses did not contain identical elements); *People v. Powell*, 299 Ill. App. 3d 92, 99-100, 701 N.E.2d 68 (1998) (comparing armed violence while armed with a category I

weapon and aggravated battery with a firearm and concluding the offenses did not contain identical elements). However, in Illinois, " 'there is only one offense of murder ***.' [Citation.]" *People v. Davis*, 205 Ill. 2d 349, 377, 793 N.E.2d 552 (2002). "[N]o distinction is made between capital and non-capital murder," and " '[t]here is no offense of murder "aggravated," as opposed to simple, murder, in Illinois.' " *Davis*, 205 Ill. 2d at 377, quoting *People v. Brownell*, 79 Ill. 2d 508, 524, 527 (1980). Specifically, " '[t]here is simply one murder statute, which includes within it a provision for the imposition of the death sentence.' [Citation.]" *Davis*, 205 Ill. 2d at 377. If there are no separate offenses of capital murder versus noncapital murder, or of aggravated murder versus simple murder, there certainly can be no separate offenses of murder by a firearm versus murder by another means as defendant here suggests. As such, there is no basis to compare "two offenses that contain identical elements." Accordingly, because there is no basis to undertake the third proportionate penalties test analysis and since this is the only test defendant relies upon to support his argument, we do not find any proportionate penalties violation.[5]

### B. Double Enhancement

Defendant next contends that the 25-year firearm-enhancement provision constitutes double enhancement because the same element, causing a death, is used as an element of the offense (murder) and to enhance his sentence.

■ Double enhancement is generally improper unless there is a clear legislative intent to the contrary. *People v. Koppa*, 184 Ill. 2d 159, 174, 703 N.E.2d 91 (1998). See also *People v. Ferguson*, 132 Ill. 2d 86, 97, 547 N.E.2d 429 (1989). As we noted in *Sawczenko-Dub*, it appears there are two different definitions or theories of thought with respect to double enhancement. The first theory states: "Double enhancement occurs when a single factor is used 'both as an element of a defendant's crime *and* as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed.' (Emphasis in original.) [Citations.]" *Moss*, 206 Ill. 2d at 533. " 'Thus, to use one of those *same* factors that make up the offense as the basis for imposing a harsher penalty than might otherwise be imposed constitutes a double use of a single factor.' (Emphasis in original.) [Citation.]" *Moss*, 206 Ill. 2d at 533. See also *People v. Rissley*, 165 Ill. 2d 364, 390,

---

[5]We note that this court has rejected proportionate penalties challenges to the firearm-enhancement provision based on the first test (*People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 529-30 (2003)) and second test (*Sawczenko-Dub*, 345 Ill. App. 3d at 531-32; *People v. Moore*, 343 Ill. App. 3d 331, 346-47, 797 N.E.2d 217 (2d Dist. 2003)).

651 N.E.2d 133 (1995); *Ferguson*, 132 Ill. 2d at 97; *People v. Milka*, 336 Ill. App. 3d 206, 235, 783 N.E.2d 51 (2003); *People v. Thompson*, 331 Ill. App. 3d 948, 958, 773 N.E.2d 15 (2002); *People v. Carney*, 327 Ill. App. 3d 998, 1003, 765 N.E.2d 1028 (2002); *People v. Sample*, 326 Ill. App. 3d 914, 930, 761 N.E.2d 1199 (2001).

The second theory has stated the rule as follows: "It is well established that double enhancement occurs when a factor previously used to enhance an offense or penalty is again used to subject a defendant to a further enhanced offense or penalty." *Koppa*, 184 Ill. 2d at 174. See also *People v. Thomas*, 171 Ill. 2d 207, 223, 664 N.E.2d 76 (1996); *People v. Ollie*, 333 Ill. App. 3d 971, 989, 777 N.E.2d 529 (2002); *People v. Phelps*, 329 Ill. App. 3d 1, 6, 768 N.E.2d 168 (2002); *People v. Watkins*, 325 Ill. App. 3d 13, 20, 757 N.E.2d 117 (2001); *People v. Childress*, 321 Ill. App. 3d 13, 28, 746 N.E.2d 783 (2001); *People v. Becker*, 315 Ill. App. 3d 980, 995, 734 N.E.2d 987 (2000).

■ Defendant's argument is apparently premised upon the first theory because the second theory is clearly not applicable since there was no original enhancement. We do not, however, find defendant's argument persuasive. This court, as well as the Second District Appellate Court in *Moore*, has already rejected defendant's argument that the appropriate factor to utilize in analyzing this question of double enhancement is "causation of a death." See *Sawczenko-Dub*, 345 Ill. App. 3d at 538; *Moore*, 343 Ill. App. 3d at 348. Rather, both the *Sawczenko-Dub* and *Moore* courts concluded that the proper factor is the "use of a firearm." *Sawczenko-Dub*, 345 Ill. App. 3d at 538; *Moore*, 343 Ill. App. 3d at 348. Likewise, both the *Sawczenko-Dub* and *Moore* courts concluded that because the firearm factor is not an inherent or essential element of murder and it is only used to impose a longer sentence, there is no double enhancement. See *Sawczenko-Dub*, 345 Ill. App. 3d at 539; *Moore*, 343 Ill. App. 3d at 348.

Even assuming we were to look at the "causing a death" element, we would not find any double enhancement. The principal statutory elements[6] of murder are: (1) a killing (or death); (2) an act by the defendant; and (3) *mens rea*. 720 ILCS 5/9—1(a) (West 2002). The fact that a death occurred (an element of murder) is not the same as the *cause* of that death, *i.e.*, the manner in which it was accomplished—whether by firearm, stabbing, bludgeoning, poisoning, etc. How a death *was caused* is not an element of murder. The focus of the firearm-enhancement provision is the *manner* in which the death oc-

---

[6]"Elements of crime" is defined as "[t]hose constituent parts of a crime which must be proved by the prosecution to sustain a conviction." Black's Law Dictionary 467 (5th ed. 1979).

curred, not the fact that it occurred. In other words, the focus of the firearm-enhancement provision is that a death occurred as a result of a discharge of a firearm. Thus, the fact that a death occurred is not being used both as an element of murder and as an aggravating factor to justify a harsher sentence. Rather, the fact that a death occurred is used as an element to convict a defendant of murder and then, and only then, the manner in which the death was accomplished, by discharge of a firearm, is used to justify a harsher sentence. Thus, the same factor is not being used as both an element of the offense of first degree murder and to increase defendant's sentence here. Accordingly, we conclude that the firearm-enhancement provision does not constitute a double enhancement.

### III. Mittimus

Defendant lastly contends, and the State does not object, that the mittimus must be corrected to reflect a total of 696 days, not 653 days, of credit for his pretrial custody against his sentence. Pursuant to Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), we order that the mittimus in this case be corrected to reflect a credit of 696 days for defendant's pretrial custody.

### CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed; mittimus ordered corrected.

CAHILL and GARCIA, JJ., concur.