SIXTH DIVISION
November 14, 2008

No. 1-06-2575

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 98 CR 9695 |
| v. | ) | |
| | ) | |
| RUSSELL HOBSON, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant, Russell Hobson, who was charged and convicted of first degree murder, appeals from the second-stage dismissal of his successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000)). He contends that the circuit court erred in dismissing his petition without an evidentiary hearing, where he made a substantial showing of ineffective assistance of counsel because (1) counsel failed to adequately communicate with him and provide him with discovery materials that he requested prior to trial and (2) counsel precluded him from exercising his right to a jury trial. For the reasons that follow, we affirm.

### I. BACKGROUND

Defendant was charged with two counts of first degree murder for the fatal shooting of Donald Horton, which occurred on March 6, 1998. Count I charged defendant with committing

1

intentional first degree murder (see 720 ILCS 5/9-1(a)(1) (West 1992)), and count II charged him with unjustifiably killing the victim "knowing that such a shooting created a strong probability of death or great bodily harm" (see 720 ILCS 5/9-1(a)(2) (West 1992)).

Prior to trial, on October 20, 1998, the trial court informed defendant of the charges against him and the possible sentences if he were found guilty. The trial court told defendant that he was entitled to a jury trial and then explained to defendant the difference between a jury and bench trial. The court asked defendant if he understood and defendant replied in the affirmative. The trial court then asked defendant how he wanted to be tried, and defendant requested a bench trial. The following colloquy then took place between the trial court and defendant:

"THE COURT: Did you discuss this matter with your lawyer?

[Defendant]: Yes.

THE COURT: Anybody forced you to give up your right to a jury trial?

[Defendant]: No.

THE COURT: Anybody threatened you to make you give up your right to a jury trial?

[Defendant]: No.

THE COURT: Anybody promise you anything to get you to give up your right to a jury trial?

[Defendant]: No.

THE COURT: All right. If I tell you right now, Mr. Hobson, I don't know if you have been told by anybody that I'm leaning one way or the other on your case, but I will

tell you right now I'm not. I know virtually nothing about the fact of your case. The only thing I know about the fact of your case is what I just read to you what you are charged with. That's literally all I know. I haven't made up my mind one way or the other, and I have no opinion at all as to the facts of your case because I know none of them.

Do you understand that?

[Defendant]: Yes.

\* \* \*

THE COURT: Jury waiver will be accepted."

At trial, the following pertinent facts were adduced. Vernon Spears testified on behalf of the State that on March 6, 1998, at about 11:15 or 11:20 p.m., he was on the corner of 55th Street and Lake Park in Chicago's Hyde Park neighborhood attempting to hail a taxi. Spears testified that he observed a Yellow Cab driven by defendant going south towards 55th Street. Spears then stated that he entered defendant's cab, sat in the backseat on the driver's side behind defendant, closed the door and told defendant where to drive him.

According to Spears, at that point another person, later identified as Donald Horton, the victim, approached the taxi. Spears testified that Horton stood at the curb, bent down to look into the cab through the front passenger window and asked defendant if he could take him where he wanted to go. According to Spears, Horton crouched and put his face partially inside the taxi, resting his arms on the bottom of the window. Spears testified that defendant then responded that he already had a fare, but that he would try to come back and pick him Horton. According to Spears, Horton then asked defendant about sharing a ride, and defendant asked Spears if he was

3

"ok with this." Spears responded that he did not want to share the ride because it was very late at night.

According to Spears, at that point, defendant told Horton that he could not take him anywhere and told him to get away from the cab, but Horton refused. Spears testified that he then saw defendant make a jerking motion and "move to the side a bit." He stated that Horton then began an argument with defendant. Spears testified that Horton told defendant: "You got a gun? I bet you got a gun." Spears also heard Horton tell defendant that he was not afraid to die, and then: "Go ahead pop me. Why don't you pop me? Just pop me."

Spears testified that he did not see any sort of weapon in Horton's hands and that throughout the argument Horton continued to stand perched inside the front passenger side window with his arms resting on the bottom of the window. Spears also averred that Horton did not reach into the cab nor make any motions as if reaching into his pocket or waistband. Spears stated that Horton did not threaten anyone and that he did not appear to be drunk.

According to Spears, after Horton told defendant to "just pop [him]," defendant reached down, pulled out a gun and pointed the gun "right in front of" Horton's face and shot him. Spears said that at that point he tried to get out of the taxi, but defendant turned around to him and said, "I'll get you home now." According to Spears, defendant then sped off in the cab going west on 55th Street. Spears implored defendant to stop, but defendant continued to drive and turned a corner. Soon thereafter, the taxi ran into a police vehicle and defendant was arrested.

On cross-examination, Spears acknowledged that he had a cocktail before entering the cab and that he chose to take a taxi because he was afraid to walk alone at night in that

4

neighborhood. Spears also acknowledged that there was a thick partition that went from the top of the front seat all the way to the roof of the car that divided the backseat from the front seat where defendant was driving. Spears stated that when Horton asked to share a ride with him, he was reluctant because he was frightened. Specifically, Spears averred that at that point he did not know what was going on and feared that he was "being set up for a ripoff." Spears also testified on cross-examination that Horton was wearing a jacket and the he could not see what was underneath it.

Daniel Son Wang next testified that on the night of March 6, 1998, he was in his car heading south on Lake Park Street when he noticed a Yellow Cab in front of him parked on the corner of 55th Street. Wang testified that he particularly noticed the taxi because the light in that intersection was green and the cab was not moving. Wang stated that as he approached the taxi he observed that there were two people inside the vehicle and one standing outside. According to Wang, by the time he pulled up right directly behind the cab, the light turned red, and he was forced to stand behind it waiting for the signal change.

Wang stated that he then observed what appeared to him to be an argument between the person standing outside the taxicab and the driver. Wang could not hear anything and could not tell exactly what was going on, but it appeared to him that the person standing outside had either just come from inside the cab or was trying to get into it. Wang testified that at one point he observed an arm extend from the taxi and heard a shot. He then saw the person standing outside the cab fall to the ground. According to Wang, the taxi quickly made a right turn onto 55th Street going west, but was quickly stopped by a police car that was already on 55th Street. Wang

testified that he exited his vehicle and ran toward the person on the ground and waited for help. Wang stated that the victim did not have a weapon on him. He also testified that he never saw the victim waving his hands around, nor pointing at the driver or reaching into the cab. At trial, Wang identified the victim from a photograph as Daniel Horton.

On cross-examination, Wang acknowledged that the person standing outside the cab was screaming and appeared to be very angry.

Officer Roman Csyrgryn testified that on March 6, 1998, at approximately 11:20 p.m., he was parked in his squad car facing east on 55th Street approximately 100 feet from Lake Park Street. Officer Csyrgryn testified that he heard a popping noise which he initially thought was a firecracker. After a few minutes, Officer Csyrgryn observed a man running towards him from the northwest corner. The man approached the officer and told him that "someone in a cab had just shot an individual on the street and that the cab was now westbound on 55th Street." Officer Csyrgryn testified that he then radioed Officer Balcar, whom he knew to be in the general vicinity of where the taxi was heading, and told her to be on the lookout for it.

Officer Csyrgryn stated that he then made a U-turn with his car and proceeded in the general direction of where he was told the cab went. Soon thereafter, Officer Csyrgryn observed a police vehicle in pursuit of a taxi, and he followed them. According to Officer Csyrgryn the taxi eventually stopped in the 5600 block of Kimbark. At that point, both he and Officer Balcar exited their respective vehicles and approached the cab. According to Officer Csyrgryn, he then asked the cab driver, whom he identified as defendant in this case, to exit the vehicle and performed a pat-down search of him, which revealed no weapons. Officer Csyrgryn, however,

6

testified that he found a Browning, 9-millimeter, gun inside a black vinyl case underneath the driver's seat of the cab.

Officer Ellen Balcar testified next that on the night of March 6, 1998, at approximately 11:20 p.m., she was in a marked squad car on 55th Street near Kimbark. Officer Balcar testified that she had just stopped a vehicle for a traffic violation, when she received an emergency call from another traffic unit that there was a cab heading westbound from Lake Park Avenue on 55th Street and that somebody inside it had shot someone. Soon thereafter, when Officer Balcar observed a cab coming in her direction, she activated her emergency equipment and followed it.

According to Officer Balcar, when the cab was eventually stopped, she instructed both the cab driver, whom she identified as defendant in the case, and the fare, whom she identified as eyewitness Spears, to exit the vehicle. Officer Balcar then asked both men what had happened, and Spears told her that "he could not believe that he had just witnessed defendant shoot someone."

The State also called Officer Thomas Costello, who testified that on March 6, 1998, at approximately 11:22 p.m. he went to the area of 5458 South Lake Park Avenue in Chicago, in response to a radio call of a man shot in that area. Officer Costello testified that once there, he found the victim's body lying on the ground, partially on the curb, partially in the street, and that he then secured the area.

Police evidence technician Joseph William Dunigan, Jr., next testified that in the early morning hours of March 7, 1998, he went to the area of 55th Street and Lake Park Avenue in Chicago with investigator Lynn Stocker to investigate the scene of a crime. Dunigan testified

that once there, he photographed the scene, where the body of the victim was lying on the floor. Dunigan also stated that he searched the body of the victim and that no weapons were recovered on him or in his immediate vicinity.

Dunigan further testified that he then went to the crime scene near 5620 South Kimbark where the taxi was located. Dunigan stated that once there he recovered a fired and expended 9-millimeter cartridge case in a metal partition right behind the passenger front seat of the cab.

The parties then stipulated that if called to testify, deputy medical examiner Barry Lifschults would testify that on March 7, 1998, he performed an autopsy on Donald Horton and that he found that the victim died as a result of a gunshot wound to the face. That autopsy also revealed that the victim's blood alcohol level was .133.[1] The parties also stipulated that if called to testify, forensic scientist and firearms expert Walter J. Kryssak would testify that on March 11, 1998, he received into evidence the 9-millimeter caliber Browning pistol, the magazine, the 11 unfired bullets, and the fired cartridge casing, recovered at the scene of the crime, as well as the bullet recovered from the body of Donald Horton during the autopsy. The parties further stipulated that Kryssak would testify that ballistics testing revealed that the gun recovered from defendant's car matched the bullet recovered from the victim's skull as well as the cartridge case found in defendant's car.

Defendant's theory of defense at trial was that he shot Horton in self-defense. Defendant

---

[1]We note that in closing argument, defense counsel indicated, and the State did not dispute, that in the State of Illinois the permissible blood alcohol level for driving purposes is below .08.

8

testified in his own behalf that on March 6, 1998, he was employed as a cab driver and had been driving a cab for over four years. On the date in question, defendant had been driving the cab for about eight hours. Just before midnight, he picked up a passenger (Spears) near Lake Park and 55th Street in Hyde Park.

After Spears entered the vehicle and told defendant where he wanted to go, defendant closed the partition dividing the front seats from the back passenger seats. Defendant testified that the partition between him and the back passenger seats was covered with fare rate papers.

According to defendant, he then put the vehicle in gear mode, but did not drive off because a light on his car panel indicated that one of the doors of the vehicle was ajar. As defendant waited for Spears to close the door completely, he saw a man, later identified as the victim Horton, approach the rear passenger door. Defendant stated that at first he assumed that Horton and Spears were together, so he did not say anything.

Defendant testified that Horton then engaged Spears in a conversation and that he opened the partition to ask Spears whether he and Horton were together. After Spears told him that they were not, defendant asked Spears if the two wanted to share a ride, and Spears indicated that he did not.

According to defendant, at this point, Horton moved from the back passenger door, which was still ajar, to the front passenger door. Defendant stated that he then rolled down the front passenger window and explained to Horton that Spears did not want to share a ride, but that because Spears was not going far, he could return quickly to pick him up and take him wherever he wanted to go.

9

According to defendant, Horton then said, "[n]o, I want to take this cab." After defendant told him that he could not, Horton started to put both his forearms on the open window. Defendant testified that at this point he became scared because he believed he was going to be robbed. Defendant asked Horton to please leave the car so that he could drop Spears off and come and pick him up later. After defendant repeated this request, Horton replied, "[w]herever you going to take him at I will be there to rob you, take the car and bust a cap on your ass."

Defendant testified that he then repositioned himself in the car so that he could see Horton better. Horton responded to this movement by saying, "[w]hat you have a gun?" Defendant testified that at that point he began to fear for his safety, and continued to be more frightened as Horton kept asking him whether he had a gun and whether he was going to "pop" him. According to defendant, at that point the man moved his hands from outside the door toward inside the car through the open window, put his head inside the car and waved his finger in defendant's face, telling him three times that he was not afraid to die. Defendant testified that when he heard the words "rob," "die" and "pop" he became frightened for his life and, therefore, pulled a handgun from underneath his seat and shot Horton. Defendant testified that at that point he was in shock and therefore just turned around and told Spears that he would drive him to his destination.

On cross-examination, defendant acknowledged that the windows in his cab had a power switch that was in working order on the day of the shooting. Defendant also testified that he did not see Horton with a gun.

On redirect examination, defendant explained that even though he did not see Horton

with the gun, he was convinced that Horton had one and was going to use it. According to defendant, Horton looked "crazy," and "obscene" and continued to yell at him that he was "not afraid to die." After Horton said this a third time, defendant saw him move his right hand from inside the car toward his pocket, to what defendant believed was "some type of weapon." Defendant testified that he understood Horton's statement that he was not afraid to die to mean that "whatever happens to him, he doesn't care who he takes with him." Defendant stated that when he saw Horton move his hand toward his jacket pocket, he pulled out his gun and shot him.

On redirect examination, defendant also testified that he has heard of at least five other cab drivers who have been robbed, shot and killed in the line of duty. He also testified that he knew two of those drivers personally.

Detective Nick Crescenzo also testified on behalf of defendant. Detective Crescenzo testified that he was assigned to investigate the murder of Donald Horton. According to the detective, as part of that investigation, he separately interviewed Spears and Wang, the two eyewitnesses to the incident. Detective Crescenzo testified that when interviewed, Spears told him that the victim leaned in the open passenger window and started arguing with the cab driver. Detective Crescenzo further testified that Wang told him that he observed the victim talking through the open passenger window and that it seemed to him that he was "arguing [and] very animated."

On cross-examination, Detective Crescenzo acknowledged that Spears only told him that the victim's head and shoulder stuck into the cab. He also testified that Wang never told him that the victim was flailing his arms.

11

After hearing closing arguments by both counsel, the circuit court found defendant not guilty of intentional first degree murder pursuant to section 5/9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 1992)) under count I of his indictment, but guilty of first degree murder pursuant to section 5/9-1(a)(2) of the Code (720 ILCS 5/9-1(a)(1) (West 1992)) under count II. The court chose to believe Spears testimony over that of defendant and therefore found that there was no mitigating evidence to reduce this to second degree murder or to murder committed in self-defense. As the court stated:

"As to Count 2, the obvious question I think is, is this a second degree murder, or self-defense, as has been raised.

For second degree murder the serious provocation requires there be one of four types: Substantial physical injury or assault, mutual quarrel or combat, illegal arrest or adultery with the offender's spouse.

Obviously none of those apply in this situation, in my view.

Going then to the second form of second degree murder, that at the time of the killing the defendant believes the circumstances to be such that if they existed it would justify or exonerate the killing, under one of the defenses listed in the criminal code.

* * *

The only places that [defendant's] testimony differs from Mr. Spears are on the things that would go to the making him either not guilty or having mitigated the offense somehow.

That is the belief that he was in imminent danger. According to Mr. Spears, who

*** had as good an opportunity to observe as a human being could possibly have.

Defendant, you committed the offense of murder and first degree.

And that is what I think you did.

I find it hard to believe that almost every conceivable fact that would tend to

mitigate this to a second degree murder or make it a not guilty, Mr. Spears, Mr. Spears

missed everyone of them.

So I think it happened like Spears said ***."

The circuit court subsequently sentenced defendant to 21 years' imprisonment. Defendant appealed his conviction and sentence. The State Appellate Defender assigned to represent defendant on appeal filed a motion to withdraw as counsel pursuant to Anders v. California, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967). On March 31, 2000, the appellate court entered an order granting defense counsel's request and affirming defendant's conviction and sentence. People v. Hobson, No. 1-99-0221 (2000) (unpublished order pursuant to Supreme Court Rule 23).

On March 6, 2001, defendant filed a *pro se* postconviction petition alleging several instances of ineffective assistance of trial counsel, including that counsel failed to allow defendant to view matters of discovery that he had specifically requested to see and that counsel precluded defendant from exercising his right to a jury trial when he advised defendant to elect a bench trial because he knew the judge and therefore knew that at a bench trial the judge would find that defendant acted in self-defense.

On March 30, 2001, the circuit court dismissed defendant's petition as untimely filed.

On appeal, we found that in light of the recent decision in People v. Boclair, 202 Ill. 2d 89, 789 N.E.2d 734 (2002), it was improper for the circuit court to summarily dismiss defendant's petition at the first stage of postconviction proceedings solely on the basis of timeliness, where timeliness was not raised by the State on a motion to dismiss. See People v. Hobson, No. 1-01-1874 (2003) (unpublished order pursuant to Supreme Court Rule 23). Accordingly, we reversed and remanded the matter for further proceedings, including appointment of counsel. See People v. Hobson, No. 1-01-1874 (2003) (unpublished order pursuant to Supreme Court Rule 23).

On remand, appointed counsel filed a supplemental postconviction petition expanding on defendant's claim that his trial counsel was ineffective for failing to share certain discovery documents that defendant had requested to see, specifically police reports which contained the identity and statements of the State's witnesses. The State filed a motion to dismiss the supplemental postconviction petition arguing that the petition was barred by the statute of limitations for postconviction petitions and that defendant's ineffective assistance of counsel contentions were insufficient to warrant an evidentiary hearing. On July 18, 2006, the circuit court dismissed the petition on the merits, but found that under People v. Rissley, 206 Ill. 2d 403, 420-21, 795 N.E.2d 174, 183-84 (2003), even though defendant's petition was untimely filed, defendant was not culpably negligent for that delay. Defendant now appeals.

## II. ANALYSIS

We begin first by noting the familiar principles regarding postconviction proceedings. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2000)) provides a means by which a defendant may challenge his conviction for "substantial deprivation of federal

No. 1-06-2575

or state constitutional rights." People v. Tenner, 175 Ill. 2d 372, 378, 677 N.E.2d 859, 861 (1997). A postconviction action is a collateral attack on a prior conviction and sentence, and "is not a substitute for, or an addendum to, direct appeal." People v. Kokoraleis, 159 Ill. 2d 325, 328, 637 N.E.2d 1015, 1017 (1994).

In a noncapital case, the Act creates a three-stage procedure of postconviction relief. People v. Makiel, 358 Ill. App. 3d 102, 104, 830 N.E.2d 731, 736 (2005). At the second stage of postconviction proceedings, such as here, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a violation of constitutional rights. People v. Edwards, 197 Ill. 2d 239, 246, 757 N.E.2d 442, 446-47 (2001). A postconviction petitioner is not entitled to an evidentiary hearing as a matter of right; rather, to require an evidentiary hearing, the allegations in the petition must be supported by the record in the case or by accompanying affidavits. People v. Coleman, 183 Ill. 2d 366, 381, 701 N.E.2d 1063, 1072 (1998). Nonspecific and nonfactual assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. Coleman, 183 Ill. 2d at 381, 701 N.E.2d at 1072-73. "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true." People v. Towns, 182 Ill. 2d 491, 501, 696 N.E.2d 1128, 1134 (1998). We review the second-stage dismissal of a post-conviction petition de novo. Coleman, 183 Ill. 2d at 388-89, 701 N.E.2d at 1075-76.

1. Timeliness

Before addressing defendant's appellate contentions, we must first resolve the important threshold matter raised by the State, namely, whether the circuit court erred in failing to dismiss

15

defendant's petition on timeliness grounds pursuant to section 122-1 of the Act (725 ILCS 5/122-1 (West 2000)). With respect to this contention, defendant acknowledges, as he did in the circuit court below, that his petition was untimely filed, but asserts that the delay can be excused because it was not due to his culpable negligence.[2] For the reasons that follow, we agree.

Under section 122-1 of the Act, a postconviction proceeding may not be commenced outside the time limitation period stated in the Act unless defendant alleges sufficient facts to show that the delay in filing his initial petition was not due to his culpable negligence. 725 ILCS 5/122-1(c) (West 2000); People v. Rissley, 206 Ill. 2d 403, 420-21, 795 N.E.2d 174, 183-84

_____

[2]In this respect, we note that there is some disagreement between the parties, albeit not crucial to the discussion of culpable negligence, as to how late the petition was filed. Both parties agree that defendant's conviction was affirmed on appeal on March 31, 2000, that he had 21 days, until April 21, 2000, to petition the Illinois Supreme Court, and thereafter six months, until October 21, 2000, to file a petition for postconviction relief. The parties, however, disagree as to when the petition was actually filed. Defendant asserts, as he did below, that the petition was filed on January 12, 2001, the date on which he signed and notarized the petition, and that therefore his petition is only three months late. The State, on the other hand, contends that the clerk of the circuit court stamped the petition on March 6, 2001, and that therefore defendant's petition was five months late. Because on appeal defendant concedes that his petition was untimely filed (albeit three months later, and not five months later as the State would contend), the dispute regarding the exact number of months tardiness is not crucial to our determination of culpable negligence.

(2003). Section 122-1(c) of the Act provides in pertinent part:

"*** no proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a petition for certiorari is not filed, no proceedings under this Article shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a defendant does not file a direct appeal, the post-conviction petition shall be filed no later than 3 years from the date of conviction, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2000).

Our supreme court has defined culpable negligence as "contemplat[ing] something greater than ordinary negligence and is akin to recklessness." People v. Boclair, 202 Ill. 2d 89, 106, 108, 789 N.E.2d 734, 744 (2002) ("Culpable negligence has been defined as '[n]egligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions.' Black's Law Dictionary 1056 (7th ed. 1999). Culpable negligence has also been defined as 'something more than negligence' involving 'an indifference to, or disregard of, consequences.' 65 C.J.S. Negligence §19 (2000)"). Our supreme court has made clear that it is imperative to construe "culpable negligence" broadly so as to ensure that defendants will not be unfairly deprived of the opportunity to have their constitutional claims adjudicated. Rissley, 206 Ill. 2d at 421, 795 N.E.2d at 183-84. As the supreme court in Rissley stated:

17

"We continue to adhere to the definition enunciated in Boclair. This definition more than adequately ensures that the portion of the statute permitting a petitioner to file an untimely petition so long as he 'alleges facts showing that the delay was not due to his culpable negligence' [citation] does not stand as empty rhetoric. Rather, the definition gives heft to the exception contained in section 122-1, an exception which this court has historically viewed as the ' special "safety valve" ' in the Act. People v. Bates, 124 Ill. 2d 81, 88 [,529 N.E.2d 230] (1988); see also People v. Wright, 189 Ill. 2d 1, 8 [,723 N.E.2d 230] (1999). Finally, this definition comports with our long-held view that the Act in general must be 'liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights.' People v. Correa, 108 Ill. 2d 541, 546 [, 485 N.E.2d 307] (1985). See also People v. Kitchen, 189 Ill. 2d 424, 435 [, 727 N.E.2d 189] (1999), citing People v. Pier, 51 Ill. 2d 96, 98 (1972) (acknowledging that 'the Act should not be so strictly construed that a fair hearing be denied and the purpose of the Act, *i.e.*, the vindication of constitutional rights, be defeated')." Rissley, 206 Ill 2d at 420-21, 795 N.E.2d at 183-84.

As the law stands today, a defendant asserting that he was not culpably negligent for the tardiness of his petition must support his assertion with allegations of specific fact showing why his tardiness should be excused. People v. Walker, 331 Ill. App. 3d 335, 339-40, 772 N.E.2d 758, 762-63 (2002) (noting that the relevant inquiry becomes whether, after accepting all well-pleaded factual allegations of defendant's petition regarding culpable negligence as true, those assertions are sufficient as a matter of law to demonstrate an absence of culpable negligence on

18

defendant's part); see also People v. Van Hee, 305 Ill. App. 3d 333, 336, 712 N.E.2d 363, 366 (1999) ("[t]o show the absence of culpable negligence, a petitioner must allege facts justifying the delay"); People v. McClain, 292 Ill. App. 3d 185, 188, 684 N.E.2d 1062, 1064 (1997) (to warrant an evidentiary hearing on the issue of whether the delay in filing postconviction relief was occasioned by culpable negligence, the defendant "must make a 'substantial showing' by alleging facts demonstrating that to be the case"), *overruled in part and on different grounds* by People v. Woods, 193 Ill. 2d 483, 739 N.E.2d 493 (2000)

In the present case, defendant asserts that the reason for his delay in filing the initial postconviction petition was his reliance on the incorrect advice from his appellate counsel. The State contends that defendant has not sufficiently alleged facts to show that the delay was not due to his culpable negligence. For the reasons that follow, we disagree.

We first note that this case is factually very similar to our supreme court decision in Rissley, 206 Ill. 2d at 420-21, 795 N.E.2d at 183-84. In Rissley, the defendant filed a *pro se* postconviction petition six days after the statutory period expired. Rissley, 206 Ill. 2d at 417-18, 795 N.E.2d at 181-82. The defendant's amended petition alleged in part that the attorney who represented him on his direct appeal told him that he had three years from the date of sentencing to file a postconviction petition. Rissley, 206 Ill. 2d at 417-18, 795 N.E.2d at 181-82. In an attached affidavit, the defendant's direct appeal counsel confirmed that he gave the defendant this advice.[3] Rissley, 206 Ill. 2d at 418, 795 N.E.2d at 181-82. The supreme court found that

_____

[3]In Rissley, it appears that in advising his client, the attorney may have relied on a prior

19

defendant had no reason to question the advice he received form his direct appeal counsel and that based on this advice he would have reasonably believed that he had timely filed his petition. Rissley, 206 Ill. 2d at 421, 795 N.E.2d at 183-84. Applying the "culpable negligence" standard articulated in Boclair, the supreme court found that defendant's conduct could not fairly be viewed as blameable and did not evidence an indifference to the likely consequences. Rissley, 206 Ill. 2d at 421, 795 N.E.2d at 183-84. Accordingly, the supreme court held that defendant had established that the delay in filing his petition was not due to his culpable negligence. Rissley, 206 Ill. 2d at 421, 795 N.E.2d at 183-84.

In the present case, just as in Rissley, defendant alleged that the reason for his delay in filing his petition was that he was misadvised by his appellate counsel that he had three years from the date of his conviction to file his postconviction petition, that he filed his petition within that incorrect deadline and that therefore he had no reason to think that his petition was untimely filed. See Rissley, 206 Ill. 2d at 421, 795 N.E.2d at 183-84. The record below reveals that in his initial sworn and verified *pro se* postconviction petition, defendant asserted that his petition was tardily filed because of the "ineffectiveness [of counsel at] both the appellate and trial court levels" because "the defendant was either told incorrectly that he had (3) three years to file a petition for Post-Conviction [relief], and (or) misinterpreted the statute, in his layman effort to

---

version of section 122-1(c), effective until July 1, 1995, under which the defendant would indeed have had three years from sentencing to file his petition. See Rissley, 206 Ill. 2d at 414-15, 795 N.E.2d at 180-81.

understand such complexities " In his supplemental postconviction petition, defendant's appointed counsel clarified this assertion, contending that defendant was not culpably negligent for tardily filing his petition, because he was "misadvised by his appellate lawyer as to the correct date for filing the petition." The supplemental petition specifically alleged that defendant's lawyer informed defendant that he had three years from the date of his sentencing (December 4, 1998) to file a postconviction petition, and that this would have given defendant until December 4, 2001, to file it. Because defendant's petition was filed before this date,[4] he contended that he was not culpably negligent for the delay.

The State nevertheless contends that Rissley is inapplicable to the case at bar, because unlike in Rissley here defendant did not attach an affidavit by his attorney corroborating his allegations. Moreover, the State contends that although in his supplemental petition defendant states that his own affidavit supports his contentions regarding timeliness, the affidavit he attaches does not reference timeliness at all, but merely goes to the merits of his petition, namely, ineffectiveness of counsel on other grounds. The State finally contends that instead of relying on Rissley, we should rely on our supreme court's decisions in People v. Lander, 215 Ill. 2d 577, 586-87, 831 N.E.2d 596, 601-02 (2005). For the reasons that follow, we disagree with the State and find those cases inapposite.

---

[4]We note that both the State's and defendant's asserted filing dates (January 12, 2001, as asserted by defendant, or March 6, 2001, as asserted by the State) fall well within the deadline allegedly given to defendant by his appellate counsel.

We first note that the determining factor in <u>Rissley</u> was not the presence of the corroborating affidavit of appellate counsel, but rather the reasonableness of defendant's reliance on the advice of his counsel with respect to the filing date. See <u>Rissley</u>, 206 Ill. 2d at 421-22, 795 N.E.2d at 184.

In addition, contrary to the State's assertion, we find that even though defendant's affidavit did not speak to the timeliness of his petition, defendant alleged enough facts in his verified *pro se* petition and his supplemental petition to substantially show that he was not culpably negligent for the tardy filing of his petition. <u>People v. Smith</u>, 268 Ill. App. 3d 574, 581, 645 N.E.2d 313, 318 (1994) (absence of affidavits is not necessarily fatal to postconviction relief if allegations stand uncontradicted and are clearly supported by the record); <u>People v. McGinnis</u>, 51 Ill. App. 3d 273, 275, 366 N.E.2d 969, 972 (1977) (noting that the absence of affidavits is not necessarily fatal to a petition for postconviction relief if the petitioner's allegations stand uncontradicted or are clearly supported by the record); <u>People v. Robinson</u>, 5 Ill. App. 3d 1065, 284 N.E.2d 505 (1972) (abstract of op.) (absence of affidavits and other supporting documents can be excused where the violation of constitutional rights is raised by petitioner's sworn statements and is borne out by the record); see also <u>Towns</u>, 182 Ill. 2d at 501, 696 N.E.2d at 1134 ("In determining whether to grant an evidentiary hearing, all well-pleaded facts *in the petition* and in any accompanying affidavits are taken as true" (emphasis added)); <u>People v. Enis</u>, 194 Ill. 2d 361, 376, 743 N.E.2d 1, 10 (2000) (same); see also <u>Walker</u>, 331 Ill. App. 3d at 340, 772 N.E.2d at 762-63 (noting that the relevant inquiry in determining culpable negligence is whether, after "accept[ing] all well-pleaded factual allegations of defendant's *petitions* as true[,]

22

No. 1-06-2575

*** those assertions are sufficient as a mater of law to demonstrate an absence of culpable negligence on defendant's part" (emphasis added)).  As noted above, defendant's sworn and verified *pro se* postconviction petition specifically alleged that the reason for his late filing was that he was told by his attorney that he had three years to file his petition.  In addition, defendant's supplemental petition specifically alleged that defendant's appellate lawyer "misadvised defendant" that he had three years from the date of his conviction to file a postconviction petition.  The petition also alleged that this gave defendant until December 4, 2001, to file his petition and that he in fact did so.  These allegations are nowhere contradicted by the record; rather, the record supports the assertion that if defendant's attorney had informed defendant that he had three years to file his petition, as defendant alleged in his sworn and verified *pro se* petition, that deadline would have been December 4, 2001, as defendant was sentenced on December 4, 1998.

    In addition, we find Lander cited to by the State inapposite.  In Lander, defendant alleged that he received erroneous advice as to the filing deadline for his petition from a law clerk employed by the prison and several "jailhouse lawyers."  Lander, 215 Ill. 2d at 587, 831 N.E.2d at 602.  This advice was subsequently confirmed by Dwayne Purble, who was identified as a "librarian or paralegal" at Taylorville prison.  Lander, 215 Ill. 2d at 587, 831 N.E.2d at 602.  The supreme court  in Lander found that defendant had not substantially shown that he was not culpably negligent for the delay in filing his petition because he did not allege why he should have reasonably relied on the advice of these individuals, who were not trained in postconviction matters.  Lander, 215 Ill. 2d at 587-88, 831 N.E.2d at 602.  In fact, according to the supreme

23

court in Lander, defendant's own conduct in seeking advice from different individuals regarding the deadline for the petition indicated that he "questioned the advice he received [on this same matter] from jailhouse lawyers and a law clerk" and therefore indicated that his reliance on their advice was not reasonable. Lander, 215 Ill. 2d at 588, 831 N.E.2d at 602. In coming to this conclusion, the supreme court in Lander distinguished Rissley by stating:

"In Rissley, the defendant was no culpably negligent in the late filing because he reasonably relied on the advice of his attorney on direct appeal, a person who had obvious expertise in legal matters and, in particular, criminal appeals. [Citation.] In contrast, defendant did not allege sufficient facts to show his reliance on the advice of jailhouse lawyers, a prison law clerk, and a law librarian or paralegal was reasonable. While defendant argues his reliance on the advice of the law clerk and law librarian was reasonable because they were employed in the prison library system, he did not allege in his pleadings that these individuals were hired to assist inmates with postconviction matters. Further, defendant did not allege the jailhouse lawyers, law clerk or librarian had any particular training in postconviction matters providing them with specialized knowledge of the filing deadline for a postconviction petition. We cannot find defendant's reliance on the advice of these individuals was reasonable ***." Lander, 215 Ill. 2d at 587-88, 831 N.E.2d at 602.

In the present case, unlike in Lander, defendant alleged that he relied on the advice of his appellate counsel, who, as the court in Rissley clearly indicated, is an individual that defendant could reasonably believe would give him the proper advice on postconviction matters. As such,

24

defendant substantially showed that the delay in filing his petition was not caused by his culpable negligence.

Having concluded that the circuit court did not err in finding that defendant's petition was not untimely filed due to defendant's culpable negligence, we now turn to the merits of defendant's petition.

2.  Ineffective Assistance of Counsel for Failure to Communicate

Substantively, defendant first contends on appeal that the circuit court erred in dismissing his supplemental postconviction petition because he made a substantial showing of ineffective assistance of counsel, where his counsel failed to adequately communicate with him, by among other things, failing to provide him with police reports that contained the names and statements of the two eyewitnesses, which he had requested.  For the reasons that follow, we disagree.

To prevail on a claim of ineffective assistance of counsel, defendant must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial.  Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17, 804 N.E.2d 638, 645 (2004).  Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim.  People v. Palmer, 162 Ill. 2d 465, 475, 643 N.E.2d 797, 801 (1994).

As to the first prong, defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy.

25

No. 1-06-2575

Bloomingburg, 346 Ill. App. 3d at 317; 5 W. LaFave, Criminal Procedure §11.10(c) at 715 (2d ed. 1999)). In determining the adequacy of defendant's legal assistance, a reviewing court will not consider isolated instances of alleged deficiencies, but rather the totality of circumstances. People v. Long, 208 Ill. App. 3d 627, 640, 567 N.E.2d 514, 523 (1990).

Under the second prong of Strickland, defendant must show that counsel's deficient performance so prejudiced the defense as to deny him a fair trial. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To show prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; Bloomingburg, 346 Ill. App. 3d at 317, 804 N.E.2d at 645. A reasonable probability is one sufficient to undermine confidence in the outcome of the proceedings. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

For the reasons that follow, we find that even if defendant were able to show that counsel's performance fell below the objective standard of reasonableness, he cannot establish the requisite prejudice, which would entitle him to an evidentiary hearing on this issue.

With respect to the first prong of Strickland, defendant here specifically contends that counsel was ineffective because he did not meet with him regularly before trial, never informed defendant of the State's evidence against him, and refused to give defendant police reports which contained the names and statements of the State's witnesses against him. In support of this contention, defendant cites to People v. Smith, 268 Ill. App. 3d 574, 577-80, 645 N.E.2d 313, 316-18 (1994), for the proposition that counsel's failure to provide defendant with police reports

26

constitutes ineffective assistance of counsel.

The State contends that we should not follow Smith, but rather the decision of the Fourth District in People v. Davison, 292 Ill. App. 3d 981, 988-89, 686 N.E.2d 1231, 1235-37 (1997), which rejected Smith, and held that a "[t]rial counsel's decision whether to provide his client with discovery materials constitutes a matter of trial strategy and judgment that ultimately lies within counsel's discretion." Davison, 292 Ill. App. 3d at 988-89, 686 N.E.2d at 1235-37.

We first observe that Smith and Davison appear to be divergent in their treatment of the first prong of Strickland, and the question of whether counsel's decision to provide his client with discovery materials is a matter of trial strategy.

In Smith, in his *pro se* postconviction petition defendant contended that his attorney concealed from him reports prepared by two police officers investigating the case. Smith, 268 Ill. App. 3d at 577, 645 N.E.2d at 316. These reports allegedly contained the victim's description of the offender and could have borne upon defendant's identity, which was an issue at trial. Smith, 268 Ill. App. 3d at 577-78, 645 N.E.2d at 316. In a motion to dismiss defendant's petition, the State contended that trial counsel was not required to hand over all documents to defendant, because this aspect of counsel's representation is a tactical decision which is beyond the scope of review. Smith, 268 Ill. App. 3d at 578, 645 N.E.2d at 317. The circuit court dismissed defendant's petition. Smith, 268 Ill. App. 3d at 578, 645 N.E.2d at 317.

The First District of the Appellate Court disagreed and held that defendant had raised a valid claim of ineffective assistance of counsel based on counsel's failure to communicate with

defendant. Smith, 268 Ill. App. 3d at 578-79, 645 N.E.2d at 317. In doing so, we first held that:

    "The sixth amendment requires that defense counsel keep defendant informed of developments in the case and consult with him on all major decisions to be made. United States ex rel. Partee v. Lane (7th Cir. 1991), 926 F.2d 694, 701; cf. 134 Ill. 2d R. 1.4(a) ('A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information')." Smith, 268 Ill. App. 3d at 579, 645 N.E.2d at 317.

The Smith court next found that counsel's concealment of the police reports was "not a tactical decision within the attorney's discretion," particularly because in that case counsel had been aware that his client was anxious to view the police reports. Smith, 268 Ill. App. 3d at 579, 645 N.E.2d at 317-18.

On the other hand, in Davison, the Fourth District held that contrary to the holding in Smith, the decision of whether to provide defendant with discovery materials lies within counsel's discretion. Davison, 292 Ill. App. 3d at 988-89, 686 N.E.2d at 1235-37. In Davison, defendant contended in his postconviction petition that his attorney was ineffective, among other things, because he refused to allow him to read the discovery materials that the State provided to defense counsel. Davison, 292 Ill. App. 3d at 984, 686 N.E.2d at 1233. Relying on Smith, the defendant in Davison contended that the sixth amendment required defense counsel to allow him to read those materials. Davison, 292 Ill. App. 3d at 988, 686 N.E.2d at 1235. The Davison court rejected this view, declined to follow Smith, and instead held that a "[t]rial counsel's decision whether to provide his client with discovery materials constitutes a matter of trial

28

strategy and judgment that ultimately lies within counsel's discretion." Davison, 292 Ill. App. 3d at 988-89, 686 N.E.2d at 1236. In coming to this conclusion, the Davison court reasoned that in a criminal case there are only five decisions, which entirely belong to defendant and which he may make even if they are contrary to the advice of his counsel: "(1) whether to plead guilty; (2) whether to waive a jury trial; (3) whether to testify in his own behalf; (4) whether to submit an instruction on a lesser charge at the conclusion of the evidence; and (5) whether to appeal." Davison, 292 Ill. App. 3d at 988, 686 N.E.2d at 1235. According to Davison, "[e]ssentially, all other trial decisions remain in the province of defense counsel, with the proviso that counsel should consult with the defendant to the extent–within counsel's discretion–such consultation would be helpful." Davison, 292 Ill. App. 3d at 988, 686 N.E.2d at 1236.

We need not here decide between Davison and Smith as to whether an attorney has an unqualified duty to provide his client with discovery materials upon a client's request, because in either event, counsel's failure to provide his client with any such materials would have to be examined under the prejudice prong of Strickland, and in the present case, defendant cannot establish that prong.

As noted above, under the second prong of Strickland, defendant must show that counsel's deficient performance so prejudiced the defense as to deny him a fair trial. See Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To show prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. See Strickland, 466 U.S. at 693, 80 L. Ed. at 674, 104 S. Ct. at 2064.

In the present case, with respect to the prejudice prong of Strickland, defendant contends that had counsel provided him with the police reports containing the statements of eyewitnesses "negating [his] defense of self defense," and had counsel discussed those statements with him, he would have certainly pled guilty and asked counsel to negotiate a guilty plea.

In support of these contentions, among other things, defendant attached to his postconviction petition his own affidavit stating:

"1. My trial attorney, Mr. Richard Dickerson, met with me only once in jail before my trial.

2. He did not discuss the value and strength of the evidence against me.

* * *

3. I asked him to show me discovery material including the police reports. At no time did he show me the police reports. Had I seen the police reports, and the statements of witnesses Daniel Wang and Vernon Spears negating my defense of self defense, I would have asked my lawyer to negotiate a plea for me. I would have pled guilty without a trial. My lawyer never discussed the statements of the State witnesses with me before the trial."

After reviewing the record, we find that these allegations contained in defendant's postconviction petition are insufficient to establish that absent counsel's failures, the outcome of defendant's proceedings would have been different. See Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Defendant neither alleges nor can he establish any prejudice.

30

While defendant claims that had he known the content of the police reports, he would have asked his attorney to negotiate a guilty plea, he does not, nor can he, establish that such a plea would have resulted in a shorter sentence. First, defendant does not, nor can he, allege that the State would have consented to a negotiated plea on a lesser charge (namely, second degree murder), which could have resulted in a lesser sentence. This is especially true in light of the fact that the State was in possession of the statements of the two eyewitnesses who later testified at defendant's trial that the victim did not have a weapon and that defendant shot the unarmed victim through the cab window after a mere verbal altercation.

Moreover, defendant does not allege, nor could he, that if he had pled guilty to the charged offense of first degree murder, instead of proceeding with a bench trial, he would have received a lesser sentence. The record reveals that the trial court sentenced defendant to 21 years' imprisonment, which was within the statutory range for the charged offense, and only one year above the statutory minimum (730 ILCS 5/5-8-1(a)(1)(a) (West 1998) (the sentencing range for first degree murder in Illinois is 20 to 60 years' imprisonment)). In addition, the record reveals that defendant had a prior 1985 conviction for attempted armed robbery. As such, there is no reasonable probability that had defendant pleaded guilty to first degree murder, he would have received a lesser sentence.

With respect to the second prong of Strickland, we acknowledge that the court in Smith allowed defendant to proceed to the third stage of postconviction proceedings and held that it was unnecessary for defendant to allege exactly how the outcome of his proceedings would have been different had his trial counsel not concealed the police reports for him. Smith, 268 Ill. App.

31

3d at 579, 645 N.E.2d at 318 (noting that "[u]ntil the [police] reports [that defense counsel concealed from his client] are examined, it is unknown whether there was a reasonable probability that, but for the concealment, the result of the trial would have been different"). However, unlike in Smith, where there was strong indication that all or any of the significant evidence contained in the concealed police reports, including the victim's initial, and potentially inconsistent and impeaching, description of the assailant, was not disclosed at trial (see Smith, 268 Ill. App. 3d at 579, 645 N.E.2d at 318), in the present case, the statements of the two eyewitnesses contained in the police reports were presented to the trier of fact through the witnesses' testimony at trial. Therefore, while in Smith, it was necessary to make an "inquiry into matters outside of the *** record" in order to resolve the issue of whether counsel was ineffective in failing to give those reports to his client (see Smith, 268 Ill. App. 3d at 578, 645 N.E.2d at 318), in the present case, all the evidence necessary for the resolution of this issue was presented to the trial court below and is contained in the common-law record. As noted above, in the present case, the trial court heard the testimony of the two eyewitnesses stating that defendant had no weapon and that defendant shot the victim only after a verbal argument. More importantly, because the State was in possession of these incriminating statements prior to trial, there is no reasonable probability that it would have agreed to negotiate a lesser charge for defendant. Therefore, unlike in Smith, in the present case, no new matter of any significance could be learned, and nothing new or different can be gained by granting defendant a third stage evidentiary hearing.

    3. Ineffective Assistance of Counsel for Coercing Defendant to Waive a Jury Trial

We further disagree with defendant's contention that the circuit court erred in dismissing his postconviction petition because he made a substantial showing of ineffective assistance of counsel where counsel coerced him into waiving his right to a jury trial by telling him that if he chose the bench trial, the trial judge would not convict him of murder. In support of this contention, defendant attached to his supplemental postconviction petition, an affidavit in which he stated the following:

> "When I told him [defense counsel] that I shot the deceased in self defense, he told me to waive a jury and take a bench trial. He told me that the judge Porter [*sic*] would find me not guilty if I took a bench trial, that he knew the judge and the judge was alright."

Defendant further attached his father's affidavit, which *inter alia*, stated that defense counsel "talked [his] son out of having a jury trial" by telling him that a "bench trial would be better because he knew the judge and that he was alright," and that "since this was a simple case of self-defense, he [defendant] had no cause to worry."

When, as here, "a defendant's challenge to a jury waiver is predicated on a claim of ineffective assistance of counsel, the court must determine: (1) whether counsel's performance fell below an objective standard of reasonableness; and (2) ' whether there exists a reasonable likelihood that the defendant would not have waived his jury right in the absence of the alleged error.' " People v. Batrez, 334 Ill. App. 3d 772, 782, 778 N.E.2d 1182, 1191 (2002), quoting People v. Maxwell, 148 Ill. 2d 116, 592 N.E.2d 960 (1992). As already noted above, "failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." Palmer, 162 Ill. 2d at 475-76, 643 N.E.2d at 801.

In the present case, defendant fails to prevail on the first strong of Strickland by overcoming the strong presumption that counsel's performance was objectively unreasonable. Strickland, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; Bloomingburg, 346 Ill. App. 3d at 316-17, 804 N.E.2d at 645. In that respect, we note that we have long held that an attorney's recommendation to a defendant in a criminal case to choose a jury trial rather than a bench trial, constitutes a matter of trial strategy and tactics and does not constitute ineffective assistance of counsel. See People v. Powell, 281 Ill. App. 3d 68, 74, 666 N.E.2d 365, 369-70 (1996) (attorney's recommendation to defendant to have a jury trial in a criminal case, rather than a bench trial, constituted a matter of strategy or tactics and could not support a claim of ineffective assistance of counsel); see also People v. Pacheco, 281 Ill. App. 3d 179, 188-89, 666 N.E.2d 370, 376-77 (1996) (counsel's advice to waive jury trial and proceed with stipulated bench trial was a strategic decision made in the face of strong evidence of defendant's guilt and did not constitute ineffective assistance); People v. Elliott, 299 Ill. App. 3d 766, 776, 702 N.E.2d 643, 650 (1998).

In light of the particular facts of this case, we cannot dismiss as unreasonable, counsel's strategic decision to advise his client to opt for a bench trial with a trial judge whom defense counsel knew as sympathetic, rather than a trial with an unpredictable jury, whom defense counsel knew nothing about. Taking, as we must, defendant's allegations as true (see Towns, 182 Ill. 2d at 501) ("[i]n determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true")), we find that defense counsel's advise to defendant to waive his right to a jury because "he knew the judge and [the

34

judge] was alright" and would find him not guilty, constituted a prediction based upon counsel's evaluation of the mitigating circumstances of the case which counsel intended to assert on behalf of defendant and his knowledge by reputation and/or by experience of the trial judge's previous record. See People v. Whitherspoon, 164 Ill. App. 3d 362, 365 (1987) (holding that defense counsel's "honest assessment of a case cannot be the basis for holding the defendant's guilty plea was involuntary"); see also People v. Edwards, 49 Ill. 2d 522, 525 (1971).

Defendant nevertheless cites to People v. Algee, 228 Ill. App. 3d 401 (1992), for the proposition that counsel must be found ineffective when he "coerces" defendant into pleading guilty. For the reasons that follow, we disagree, and find that case inapposite.

There, defendant entered a plea of guilty to the charge of first degree murder based on accountability principles. Algee, 228 Ill. App. 3d at 402. After entering his guilty plea, defendant retained new counsel and filed a motion to withdraw his guilty plea. Algee, 228 Ill. App. 3d at 402. The trial court denied that motion and defendant appealed. Algee, 228 Ill. App. 3d at 402.

On appeal, defendant raised five points in support of his position that the trial court's denial of his motion to withdraw his guilty plea should be reversed, including that his trial counsel was ineffective. Algee, 228 Ill. App. 3d at 403. Among a laundry list of counsel's insufficiencies, defendant contended that counsel was ineffective because he "coerced" him into pleading guilty by "relating misinformation and/or threats designed to encourage defendant to plead guilty." Algee, 228 Ill. App. 3d at 404.

35

At a hearing on the motion to withdraw defendant's guilty plea, defendant specifically contended that on the morning of his trial, counsel told him that the judge was going to sentence him to 120 years on his drug charge if he did not accept the plea offered by the State. Algee, 228 Ill. App. 3d at 404. "Others who were present at the conversation between defendant and counsel prior to trial testified, or if allowed to testify, would have stated [that] defense counsel did inform defendant [that] he was going to get the maximum sentence on his drug charges if he did not plead guilty." Algee, 228 Ill. App. 3d at 404. While defense counsel denied having made such a statement, he admitted, among other things, that he believed that the judge would "unload" on defendant if given the opportunity. Algee, 228 Ill. App. 3d at 404.

After reviewing the evidence presented at the motion to withdraw defendant's guilty plea, the appellate court found that defense counsel's overall conduct was ineffective. Algee, 228 Ill. App. 3d at 404. However, in doing so, the appellate court first noted that a suggestion by counsel that defendant would receive an enhanced sentence if he did not plead guilty would not by itself constitute ineffective assistance of counsel. Algee, 228 Ill. App. 3d at 404-06. The court, nevertheless, then went on to conclude that under the facts of that case, "defense counsel's conduct as a whole went far beyond the 'suggestion' stage." Algee, 228 Ill. App. 3d at 404-06.

Unlike in Algee, where the evidence presented at the evidentiary hearing on defendant's motion to withdraw his guilty plea established that defense counsel's warning that if defendant did not plead guilty he would be sentenced to 120 years in prison were tantamount to "threats," and therefore went beyond the "suggestion" state, in the present case, defense counsel's conduct reassuringly predicted that defendant's interest would better be served by taking a bench trial

rather than a jury trial. Counsel's statement here, however, did not warn defendant as it did in Algee that his refusal to take a bench trial would result in any catastrophic consequences. At best, it merely indicated to defendant that his chances of acquittal were better with a bench than a jury trial. Even under Algee, that kind of suggestion would not rise to the level of coercion so as to vitiate counsel's effectiveness. See Algee, 228 Ill. App. 3d at 404-06 (holding that "it is true that defense counsel's 'suggestion' of the imposition of a larger sentence if defendant were not to plead guilty does not by itself invalidate a guilty plea"); see also Edwards, 49 Ill. 2d at 525 (holding that defendant was not coerced into pleading guilty by his counsel's advice that he would receive a shorter sentence if he pleaded guilty); Whitherspoon, 164 Ill. App. 3d at 365 (holding that defense counsel's "honest assessment of a case cannot be the basis for holding the defendant's guilty plea was involuntary").

Moreover, defendant here cannot contend that his counsel's advice went beyond the suggestion state in light of the record which reveals that at the pretrial hearing defendant himself indicated that no one had "forced him," "threatened him" or "promised him anything in return" for his waiver of a jury trial. Moreover, defendant cannot contend that his counsel's advice went beyond a prediction that the judge would rule in his favor, where at the same pretrial hearing defendant indicated that he understood when the judge informed him that "if you have been told by anybody that I'm leaning one way or the other on your case, *** I will tell you right now that I'm not." As such, for the reasons already discussed above, we find defendant's contentions without merit. _____

III. CONCLUSION

37

No. 1-06-2575

 For the aforementioned reasons, we affirm the judgment of the circuit court.

 Affirmed.

 O'MALLEY, P.J., and McBRIDE, J., concur.

No. 1-06-2575

| | |
|---|---|
| Please use the following form | PEOPLE OF THE STATE OF ILLINOIS, |
| | Respondent-Appellee, |
| | v. |
| | RUSSELL HOBSON, |
| | Petitioner-Appellant. |
| | No. 1-06-2575 |
| Docket No. | Appellate Court of Illinois |
| COURT | First District, SIXTH Division |
| Opinion Filed | November 14, 2008 |
| | (Give month, day and year) |

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:

| | |
|---|---|
| JUSTICES | PRESIDING JUSTICE O'MALLEY and JUSTICE McBRIDE concur. |
| | Lower Court and Trial Judge(s) in form indicated in margin: |
| APPEAL from the Circuit Court of Cook County; the Hon Judge Presiding. | Appeal from the Circuit Court of Cook County; |
| | The Hon. Dennis J. Porter Judge presiding.. |
| APPELLANTS | Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word FOR NONE if not represented. |

39

No. 1-06-2575

John Doe, of Chicago

For APPELLEES,  :            FOR APPELLANT:  Michael J. Pelletier, Deputy Defender, Stephanie A. Fisher, Assistant Appellate Defender, Office of the State Appellate Defender, 203 N. LaSalle Street, 24th Floor, Chicago, IL 60601

Smith and Smith of

Chicago,                     APPELLEE: Richard A. Devine, State's Attorney, Cook County, James E. Fitzgerald, Peter Fisher, and Kathleen Warnick, Assistant State's Attorneys, Of Counsel, Richard J. Daley Center, Room 309, Chicago, IL 60602

Add attorneys for third-party appellants and/or appellees.